H. Wayne MAYHUE, M.D., Appellant,

v.

Charles SPARKMAN, Appellee.

No. 10S05–9507–CV–897.

Supreme Court of Indiana.

July 26, 1995.

Gregory J. Bubalo, Tracy S. Prewitt, Ogden Newell & Welch, Louisville, KY, for appellant.

James V. Donadio, David J. Mallon, Michael A. Wukmer, Ice Miller Donadio & Ryan, Indianapolis, for The Ins. Institute of Indiana, Inc.

Kevin Charles Murray, Locke Reynolds Boyd Weisell, Indianapolis, for The Indiana State Medical Ass'n and The Indiana Defense Lawyers Ass'n.

Richard L. Fairchild, Stephen J. Peters, Jill L. McCrory, Stewart & Irwin, Indianapolis, for The Medical Protective Co.

Nicholas F. Stein, New Albany, Steven A. Gustafson, New Albany, for appellee.

Mary A. Findling, Deborah K. Pennington, Stephanie L. Franco, Price & Barker, Indianapolis, for The Indiana Trial Lawyers Ass'n.

ON PETITION TO TRANSFER

DeBRULER, Justice.

This case comes to us on petition to transfer. Ind. Appellate Rule 11(B)(2)(c). Appellee Charles Sparkman instituted this medical malpractice suit, claiming loss of consortium resulting from the death of his wife, Norma Sparkman. The Medical Review Panel issued a unanimous opinion that Mayhue did not satisfy the standard of care, but that this inadequate care was not a cause of Mr. Sparkman's damages. The trial court denied Appellant Dr. H. Wayne Mayhue's motion for summary judgment and he sought an interlocutory appeal. Ind. Trial Rule 56; Ind. Appellate Rule 4(B)(6). The Court of Appeals affirmed, adopting a "pure" loss of chance doctrine. *Mayhue v. Sparkman* (1994), Ind.App., 627 N.E.2d 1354, *reh'g denied.* We grant transfer to decide a single issue: whether Indiana law recognizes, in medical malpractice claims, a separate loss of chance doctrine. ·

**Facts**

The parties do not dispute the facts. Dr. Mayhue first diagnosed decedent, Mrs. Charles Sparkman, with cervical cancer in 1981. At that time she was treated with a full course of radiation therapy. She continued to visit Dr. Mayhue until February 1985, receiving at that time a pap smear that indicated that no malignant cells were present. She continued her medical treatment with her family physicians, the Havens Medical Group. According to her Havens Group medical records, Mrs. Sparkman received pap smears in August 1985, September 1986, February 1987, July 1987, March 1988, and October 1988; none indicated the presence of atypical cells.

On May 18 and May 23, 1989, Dr. Jordan performed pap smear tests on Mrs. Sparkman that indicated the presence of cancer. He referred her to Dr. Mayhue, whom she saw on May 26. Dr. Mayhue performed a clinical examination which showed the continued presence of a constricting ring within the vagina in addition to atrophic vaginitis.[1] He prescribed estrogen cream for the atrophic vaginitis and Trysul vaginal cream to treat spotting and bleeding.

Mrs. Sparkman informed Dr. Mayhue that Dr. Jordan had told her that the results of her tests were abnormal. She did not bring the reports with her or tell Dr. Mayhue that any of her tests had indicated the presence of cancer. Dr. Mayhue performed a pap smear during this visit; the results were atypical but did not suggest a recurrent malignancy. The pathologist recommended a biopsy or a colposcopy. A colposcopy, an examination of the vagina and cervix using a magnifying lens, was impossible due to the vaginal constriction. Dr. Mayhue did not order a biopsy or an additional pap smear because he believed that the abnormal cells were caused by the inflammatory process within her vagina and the formation of fibrous tissue as her body reacted to earlier radiation therapy. He prescribed medication and estrogen cream, telling Mrs. Sparkman that he would repeat the pap smear in three to six months.

Dr. Mayhue next saw Mrs. Sparkman on June 23, 1989. She continued to suffer from atrophic vaginitis and a constricting ring within her vagina. He advised her to continue to use the estrogen cream and return in three months. She returned on September 13, 1989. Her atrophic vaginitis continued, as did the constricture of her vagina. He examined her cervix and discovered no lesions. The uterus was normal size and he advised her to continue using the cream.

On November 10, 1989, Mrs. Sparkman returned to Dr. Mayhue's office. She had pain in the area above the pubic arch and felt that there might be a lump there. He discovered a slightly enlarged uterus, some vaginal narrowing, and continuing atrophic vaginitis. She received a pap smear and Dr. Mayhue advised her to return in a week for an ultrasound of her pelvis. The ultrasound revealed some findings which were consistent

---

1. Atrophic vaginitis is the thinning and atrophying of the epithelium (thin skin) of the vagina, usually resulting from diminished endocrine · stimulation. It is common in postmenopausal women.

with the presence of a uterine tumor. The cervical region of the uterus appeared normal and there was no sign of adjacent growths.

Mrs. Sparkman's November 10, 1989, pap smear revealed the presence of malignant cells. Dr. Mayhue discussed these results with Mr. and Mrs. Sparkman on November 17, 1989. The doctor discussed the possibility of radical surgery, which involves the removal of the patient's bladder, rectum, vagina, uterus, fallopian tubes and ovaries. Dr. Mayhue referred the Sparkmans to Dr. Purcell and Dr. Day, oncologists at the Brown Cancer Center in Louisville, Kentucky, for further treatment.

On January 5, 1990, Dr. Day made an exploratory incision into the abdomen as a prelude to possible radical surgery. This abdominal operation permitted Dr. Day to observe the extent of Mrs. Sparkman's disease and determine whether radical surgery was an option. He discovered that the disease had penetrated her abdominal cavity and spread to the first part of her large intestine. This spreading of the cancer within the abdominal cavity made radical surgery impossible. Mrs. Sparkman began receiving chemotherapy, but died in November 1990.

## Summary Judgment

■ A grant of summary judgment requires that the evidence show that there exists no issue of material fact and that the moving party is entitled to judgment as a matter of law. T.R. 56(C); *Speedway Int'l Trucks, Inc. v. Rosselle* (1995), Ind., 648 N.E.2d 1161, 1162. In his motion for summary judgment, Dr. Mayhue claimed that since all the experts agreed that even if he had diagnosed the recurrence of cancer earlier Mrs. Sparkman had a less than 50 percent chance of recovery, it was not possible that his negligence was the proximate cause of Mrs. Sparkman's death. The trial court denied the motion. There is no factual dispute with respect to the proposition that it is more likely than not that Mrs. Sparkman would have died even with proper treatment. When reviewing a motion for summary judgment where there exist no factual disputes,

the Court's task is to apply the relevant law to the undisputed facts. *Id.* This Court faces the same issues that were before the trial court and follows the same process. *Department of State Revenue v. Caylor-Nickel Clinic* (1992), Ind., 587 N.E.2d 1311, 1313. Where there is no genuine issue of material fact, we will only affirm a denial of summary judgment if we find that the moving party is not entitled to judgment as a matter of law.

## Traditional Medical Malpractice

Indiana passed its own medical malpractice act in 1975. The Indiana Medical Malpractice Act [2] was adopted by the General Assembly in an effort to maintain the availability of healthcare services in Indiana, that it believed was being eroded by tort suits, and to help control the costs of medical liability insurance, litigation, settlements, and excessive judgments against healthcare providers. *Johnson v. St. Vincent Hospital, Inc.* (1980), 273 Ind. 374, 379, 404 N.E.2d 585, 589–90.

■ The statute established the framework for pursuing medical malpractice claims in Indiana. Specifically, it requires that, before a lawsuit is pursued, the Medical Review Panel determine whether the physician's behavior constituted malpractice and whether that malpractice caused the the plaintiff's injury. The conclusion of that board is not decisive. In this case, the board found that there had been malpractice but that it was not the cause of the Mrs. Sparkman's death.

■ Mr. Sparkman is suing Dr. Mayhue for medical malpractice seeking compensation for his loss of consortium. Since this is not a wrongful death case, Mr. Sparkman's claim is purely derivative, i.e., he must prove all the elements of a tort against Mrs. Sparkman or he will not be entitled to recover. In a medical malpractice case those elements are: (1) that the physician owed a duty to the plaintiff; (2) that the physician breached that duty; and (3) that the breach proximately caused the plaintiff's injuries. *Watson v. Medical Emergency Services* (1989), Ind. .

**2.** Ind.Code §§ 16–9.5–1–1 to 16–9.5–10–3 (repealed 1993). The Medical Malpractice Act is now codified as Ind.Code Ann. §§ 27–12–2–1 to –18 (West Supp.1994).

App., 532 N.E.2d 1191, 1193, *reh'g denied,* *trans. denied.*

■ Where a patient's illness or injury already results in a probability of dying greater than 50 percent, an obvious problem appears. No matter how negligent the doctor's performance, it can never be the proximate cause of the patient's death. Since the evidence establishes that it is more likely than not that the medical problem will kill the patient, the disease or injury would always be the cause-in-fact. The plaintiff must ordinarily prove that proper diagnosis and treatment would have prevented the patient's injury or death. In cases such as this one, it appears that a defendant would always be entitled to summary judgment. *See* Annotation, *Medical Malpractice: "Loss of Chance" Causality,* 54 A.L.R.4th 10 (1987).

### "Pure" Loss of Chance

Mr. Sparkman claims that he should recover because Dr. Mayhue's negligence decreased his wife's chance of receiving effective treatment for uterine cancer, leading to Mr. Sparkman's loss of consortium. He claims that support for this cause of action is found in the "loss of chance" doctrine.[3]

The "loss of chance" doctrine is usually traced to *Hicks v. United States,* 368 F.2d 626 (4th Cir.1966). In *Hicks* the plaintiff, the personal representative of an estate, sued for wrongful death, alleging medical malpractice. The decedent, a military dependent, had gone to the U.S. Navy dispensary complaining of intense abdominal pain and constant vomiting. The doctor on duty at the dispensary misdiagnosed the problem as being minor, prescribed drugs to relieve the pain, and told her to return in eight hours. The patient returned home and, a short time later, fell to the floor unconscious. She was rushed back to the dispensary but died of serious intestinal problems.

The United States Court of Appeals for the Fourth Circuit, interpreting Virginia law, concluded that:

> When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable.

*Hicks,* 368 F.2d at 632. The court relied on an earlier case brought under the Jones Act, 46 U.S.C. § 688. *Gardner v. Nat'l Bulk Carriers, Inc.,* 310 F.2d 284 (4th Cir.1962), *cert. denied,* 372 U.S. 913, 83 S.Ct. 728, 9 L.Ed.2d 721 (1963). The *Gardner* court, discussing the duty to rescue a seaman lost at sea, wrote:

> The duty arises when there is a reasonable possibility of rescue. Proximate cause is tested by the same standard, i.e., causation is proved if the master's omission destroys the reasonable possibility of rescue. Therefore, proximate cause here is implicit in the breach of duty. Indeed, the duty would be empty if it did not itself embrace the loss as a consequence of its breach. Once the evidence sustains the reasonable possibility of rescue, ample or narrow, according to the circumstances, total disregard of the duty, refusal to make even a try, as was the case here, imposes liability.
>
> Moreover, the master's default—virtually complete—is emphasized by another consequence flowing therefrom. It obliterated all possibility of evidence to prove whether a search if undertaken, would have succeeded or failed.

*Id.* at 287. The idea that plaintiffs were owed compensation for decreased opportunity to be saved, even where survival was unlikely in any case, had crystallized.

The loss of chance doctrine has since become an established part of state tort law. The compensable injury is not the result, which is usually death, but the reduction in the probability that the patient would recover or obtain better results if the defendant had not been negligent. *See, e.g., Perez v. Las Vegas Medical Center,* 107 Nev. 1, 805 P.2d

---

3. Also called the "lost chance" doctrine. *See, e.g., Wollen v. DePaul Health Center,* 828 S.W.2d 681, 683 (Mo.1992) (en banc).

589 (1991). The doctrine has also received a large amount of attention from academics. *See, e.g.,* Joseph King, *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences,* 90 Yale L.J. 1353 (1981).

## § 323

There is an alternative approach when a negligent health care provider claims that the recovery of damages is not warranted because the patient would have suffered injury or death anyway. This alternative finds support in the Restatement (Second) of Torts § 323 (1965). That section reads, in pertinent part, as follows:

> One who undertakes, gratuitously or for consideration, to render services which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> > (a) his failure to exercise such care increases the risk of such harm. . . .

This approach establishes a more procedurally-oriented response to such claims. Specifically, courts have established the rule that once the plaintiff proves negligence and an increase in the risk of harm, the jury is permitted to decide whether the medical malpractice was a substantial factor in causing the harm suffered by the plaintiff.

An early application of the doctrine in the state courts occurred approximately a decade before this case arose. *Herskovits v. Group Health Coop. of Puget Sound,* 99 Wash.2d 609, 664 P.2d 474 (1983) (en banc). In *Herskovits,* the decedent went to Group Health Hospital and complained of pain and coughing. After an examination, he was treated with cough medicine. Later he was checked by a private physician and found to have lung cancer. His lung was removed but he died less than two years after the surgery.

Decedent's personal representative brought suit, alleging medical malpractice as the cause of the wrongful death. Experts agreed, however, that there existed only a 39% chance of recovery even if the illness had been detected at the earlier visit. The trial court granted defendant's motion for summary judgment on the issue of causation. On appeal, the Supreme Court of Washington reversed, holding that, under a § 323 analysis, the estate could continue the suit and possibly recover for the increased risk as a cause of the harm suffered. *Id.,* 664 P.2d at 477 (per Dore, J., with one judge concurring and four judges concurring specially).[4] When § 323 governs a case, it permits the plaintiff to avoid summary judgment on the issue of proximate cause even when there was a less than 50 percent chance of recovery absent the negligence. The *Herskovits* court made this clear:

> [O]nce a plaintiff has introduced evidence that a defendant's negligent act or omission increased the risk of harm to a person in plaintiff's position, and the harm was in fact sustained, 'it becomes a question for the jury as to whether or not that increased risk was a substantial factor in producing the harm.'

*Id.* (per Dore, J., with one judge concurring and four judges concurring specially) (quoting *Hamil v. Bashline,* 481 Pa. 256, 392 A.2d 1280, 1286 (1978)). The plaintiff must still prove by a preponderance of evidence that the defendant's negligence was a substantial factor in causing the plaintiff's harm. *See McKellips v. Saint Francis Hosp., Inc.,* 741 P.2d 467, 475 (Okl.1987).

■ This is a complicated and sensitive area of the law, touching many areas of legal theory and policy. The Supreme Court of Oklahoma accurately described the situation. After indicating that the majority of jurisdictions that have considered the loss of chance doctrine have adopted it in some form, that court wrote:

> After a considered reading of those cases, we believe that the Restatement (Second) of Torts § 323 approach . . . to be the preferable and most rational theory. We

---

4. This case also provides support for the "pure" loss of chance doctrine. "The family of the decedent should also be allowed to maintain an action for the *lost chance of recovery* by the decedent." *Id.* at 487 (Opinion of Pearson, J., with Williams, C.J., and Utter and Stafford, JJ., concurring) (emphasis added).

think in those situations where a health care provider deprives a patient of a significant chance for recovery by negligently failing to provide medical treatment, the health care professional should not be allowed to come in after the fact and allege that the result was inevitable inasmuch as that person put the patient's chance beyond the possibility of realization. Health care providers should not be given the benefit of the uncertainty created by their own negligent conduct. To hold otherwise would in effect allow care providers to evade liability for their negligent actions or inactions in situations in which patients would not necessarily have survived or recovered, but still had a significant chance of survival or recovery.

*Id.* at 474. While the policy arguments for each position are strong, as evidenced by the fact that each has been adopted by multiple state courts,[5] the § 323 analysis is most consistent with Indiana law, particularly our strong faith in the ability of the jury to decide such complex questions. Accepting the § 323 approach does not require a *separate* loss of chance doctrine.

### Conclusion

Accordingly, we grant transfer, vacate the opinion of the Court of Appeals, affirm the trial court's denial of summary judgment, and remand this case to the trial court for further consistent proceedings.

SHEPARD, C.J., and DICKSON and SULLIVAN, JJ., concur.

SELBY, J., is not participating in this case.

---

**5.** *See, e.g., Gooding v. University Hosp. Bldg., Inc.,* 445 So.2d 1015 (Fla.1984) (applying traditional proximate cause and rejecting loss of chance); *Cooper v. Sisters of Charity of Cincinnati, Inc.,* 27 Ohio St.2d 242, 272 N.E.2d 97 (1971) (same); *Thompson v. Sun City Community Hosp., Inc.,* 141 Ariz. 597, 688 P.2d 605 (1984) (adopting § 323 approach); *Aasheim v. Humberger,* 215 Mont. 127, 695 P.2d 824 (1985); *DeBurkarte v. Louvar,* 393 N.W.2d 131 (Iowa 1986) (adopting lost chance doctrine); *Scafidi v. Seiler,* 119 N.J. 93, 574 A.2d 398 (1990) (applying § 323 but adopting loss of chance as measure of damages).