James H. SMITH, Appellant/Cross–Appellee–Plaintiff,

v.

Wilbert WASHINGTON, M.D., Appellee/Cross–Appellant–Defendant.

No. 49A04–9808–CV–398.

Court of Appeals of Indiana.

Sept. 28, 1999.

Thomas C. Doehrman, Conour Doehrman Starkey, Indianapolis, Indiana, Attorney for Appellant.

Todd J. Kaiser, Peter H. Pogue, Locke Reynolds Boyd & Weisell, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

RILEY, Judge

### STATEMENT OF THE CASE

Plaintiff–Appellant, James Smith (Smith), appeals the trial court's conclusion that the damages awarded to him be reduced by fifty percent (50%). Defendant–Appellee–Cross–Appellant, Wilbert Washington, M.D., (Washington), cross-appeals from the trial court's judgment entered in favor of Smith.

We reverse in part and affirm in part.

### ISSUES

Smith raises several issues for review, which we consolidate and restate as:

1. Whether the trial court properly applied § 323 of the Restatement (Second) of Torts to this action.

2. Whether the trial court properly reduced the damages awarded to Smith by fifty percent (50%).

In his cross-appeal, Washington raises several issues for review, which we consolidate and restate as:

3. Whether the applicable statute of limitations barred Smith's Complaint.

4. Whether the trial court erred when it denied Washington's request for jury trial.

5. Whether the trial court erred in determining that Smith was not contributorily negligent.

### FACTS AND PROCEDURAL HISTORY

Washington is an ophthalmologist who maintained a practice in Indianapolis, Indiana. Smith first became a patient of Washington's on July 10, 1990, after being referred by his family physician. At that time, Smith suffered from glaucoma[1] in his right eye. In the course of his treatment of Smith, Washington failed to document a specific or working diagnosis of the type of glaucoma Smith had in his right eye. On July 18, 1990, and July 25, 1990, Washington performed laser surgery (an iridotomy) to reduce the intraocular pressure. These procedures only provided temporary relief of the intraocular pressure. Washington testified that on September 24, 1990, he advised Smith to have additional surgery, but Washington's records fail to show whether he advised Smith as to the type of surgery that was to be performed or the risks and benefits of the surgery. This failure prevented Smith

---

1. Glaucoma is an eye disease which if not properly treated will gradually destroy the optic nerve, causing permanent loss of vision in the affected eye, and is characterized by increased intraocular pressure in the eye which often causes pain in and about the eye. (R. 15).

from making an informed decision as to whether or not to proceed with surgery.

Throughout Washington's treatment of Smith, Smith's intraocular pressure in his right eye remained well above normal, and the pressure was sufficiently high to cause irreversible damage to the optic nerve. Washington never adequately brought Smith's right eye intraocular pressure under control. At the time Smith left Washington's care, he had no light perception in his right eye and never regained any useful vision in that eye.

Due to a change in health insurance coverage, Smith was referred by his new primary care physician to another ophthalmologist, Dr. Daniel Robinson (Robinson). Smith saw Robinson for the first time on January 29, 1993. On February 23, 1993, Robinson performed a molteno implant surgery to relieve the intraocular pressure in Smith's right eye. Although this procedure relieved the elevated intraocular pressure, it did not stop the continued deterioration of the right eye. Thus, on May 31, 1995, Smith had his right eye removed. Smith was fitted with an acrylic, prosthetic eye.

Smith filed his proposed Complaint against Washington with the Department of Insurance on October 14, 1993. On October 15th and 16th, 1997, December 1, 1997, and April 13, 1998, a bench trial was held in this case. On July 2, 1998, the trial court issued its Findings of Fact and Conclusions of Law, and entered Judgment in Smith's favor. The trial court found Washington negligent for: 1) failing to keep legible and complete medical records regarding Smith; 2) failing to perform the proper procedures and medical tests to diagnose the specific type of glaucoma which Smith had in his right eye; 3) failing to document the condition of the optic nerve in Smith's right eye; and 4) failing to reduce the elevated intraocular pressure in Smith's right eye within a reasonable amount of time or in the alternative, failing

to refer Smith to another physician for that purpose.

The trial court found that with proper medical treatment of the glaucoma, Smith had at least a 50% chance of retaining vision in his right eye. The trial court further found that Washington's negligence was a substantial factor in causing Smith: 1) to lose all vision in his right eye; 2) to suffer continuing pain and discomfort in his right eye for over two (2) years, and 3) to suffer the eventual enucleation[2] of his right eye. The trial court determined that Smith sustained damages totaling $364,037.84. However, the trial court reduced Smith's damage award by fifty percent (50%) equaling the percentage of chance that he had of maintaining vision in his right eye with proper medical care. Thus, the trial court entered a judgment in Smith's favor in the amount of $182,018.92. Thereafter, this appeal ensued.

## DISCUSSION AND DECISION

### Standard of Review

When a trial court issues findings of fact and conclusions of law, we must first determine whether the evidence supports the trial court's findings and then determine whether the findings support the judgment. *City of Muncie v. Lowe*, 705 N.E.2d 528, 530 (Ind.Ct.App.1999) *trans. denied.* The reviewing court may affirm the judgment on any legal theory supported by the findings and the judgment will only be reversed when it is clearly erroneous. *Id.* "Findings of fact are clearly erroneous when the record lacks any reasonable inferences from the evidence to support them." *Id.* To determine whether the findings or conclusions are clearly erroneous we will not reweigh the evidence or assess the credibility of the witnesses, and we consider only the evidence favorable to the judgment and all reasonable inferences therefrom. *Id.*

2. The surgical removal of the eye.

All issues raised by the parties herein will be considered within the constraints of this standard of review.

### 1. *Restatement (Second) of Torts, § 323*

■ Smith first argues that the trial court improperly applied § 323 of the Restatement (Second) of Torts to this case. In 1995, our Supreme Court adopted the "increased risk of harm" standard set forth in § 323 as a method of determining "causation" in medical malpractice cases. *Mayhue v. Sparkman*, 653 N.E.2d 1384, 1388 (Ind.1995). The issue that confronted the *Mayhue* Court was whether a health care provider was liable for the increased risk of harm caused to a patient, where the patient, as a result of injury or illness, already had a less than fifty percent (50%) chance of recovery, and the health care provider's negligence caused that patient to suffer an increased risk of injury or death. *Id.* at 1387. Our Supreme Court noted that a traditional proximate cause analysis would result in the following conclusion:

Where a patient's illness or injury already results in a probability of dying greater than 50 percent, an obvious problem appears. No matter how negligent the doctor's performance, it can never be the proximate cause of the patient's death. Since the evidence establishes that it is more likely than not that the medical problem will kill the patient, the disease or injury would always be the cause-in-fact. The plaintiff must ordinarily prove that proper diagnosis and treatment would have prevented the patient's injury or death. In cases such as this one, it appears that a defendant would always be entitled to summary judgment.

*Id.*

However, with the adoption of § 323 by the *Mayhue* court, plaintiffs with a less than fifty percent (50%) chance of recovery, who have suffered a decreased chance of recovery from illness or injury due to the negligence of a health care provider, are provided with a means of recovery.

Restatement (Second) of Torts § 323 (1965) states as follows:

One who undertakes, gratuitously or for consideration, to render services which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of harm ...

Thus, to prove the health care provider's liability under a § 323 analysis, a plaintiff must demonstrate that the defendant was negligent, the negligent act increased the risk of harm, and that the increased risk was a substantial factor in causing the harm suffered to plaintiff. *Cahoon v. Cummings*, 715 N.E.2d 1, 7 (Ind.Ct.App. 1999) (citing *Mayhue*, 653 N.E.2d at 1388).

Here, the trial court, relying on *Mayhue*, 653 N.E.2d 1384, applied a § 323 analysis and concluded that Smith proved by a preponderance of the evidence that Washington's negligent act or omission increased the risk of harm to Smith, that Smith was harmed, and that Washington's negligence was a substantial factor in causing the harm to Smith.

Smith argues that the trial court should not have applied § 323 of the Restatement (Second) of Torts to this case because the trial court determined that with proper medical treatment, he had at least a 50% chance of retaining useful vision in his right eye and avoiding the enucleation of that eye. Smith contends that in cases where a plaintiff proves he has a fifty percent (50%) or more chance of recovery or survival, it is unnecessary to employ a § 323 analysis, and instead a traditional proximate cause analysis should be used. In response, Washington contends that Smith has waived this argument because Smith argued for the application of § 323 in the trial court. In his post-trial brief, Smith presented this case as an "increased

risk of harm" case pursuant to *Mayhue,* 653 N.E.2d 1384.

■ We agree with Washington that Smith has waived this argument. Smith cannot invite error and then request relief on appeal based upon that ground. An error invited by the complaining party is not reversible error. *Cuto v. State,* 709 N.E.2d 356, 361 (Ind.Ct.App.1999) (citations omitted); *see also Crowl v. Berryhill,* 678 N.E.2d 828, 830 (Ind.Ct.App.1997) ("Invited error is not subject to review by this court."). By arguing for the application of § 323 of the Restatement (Second) of Torts in the trial court, Smith has waived the argument on appeal that the trial court improperly applied that section to this case.

### 2. *Recoverable Damages*

Smith next argues that the trial court improperly decreased his damage award by fifty percent (50%), reducing his judgment award from $364,037.84 to $182,018.92. The trial court found that with proper medical treatment, Smith had at least a 50% chance of retaining vision in his right eye, and therefore, the trial court multiplied Smith's total damages by the percentage of the chance of recovery that Smith lost due to Washington's negligence.

In explaining this decision, the trial court issued the following Conclusions of Law:

> 10. Although *Mayhue,* supra, provides the standard for proof of proximate cause in a § 323 case, it does not set forth the manner in which damages should be computed. The case relies heavily on holdings from other jurisdictions, especially *McKellips v. Saint Francis Hosp., Inc.,* 741 P.2d 467 (Okl. 1987). Mayhue quotes the Oklahoma Supreme Court with approval of its reasoning:
>
> > "After a considered reading of those cases, we believe that the Restatement (Second) of Torts § 323 approach ... to be the preferable and most rational theory. We think in those situations where a health care provider deprives a patient of a significant chance for recovery by negligently failing to provide medical treatment, the health care professional should not be allowed to come in after the fact and allege that the result was inevitable inasmuch as that person put the patient's chance beyond the possibility of realization. Health care providers should not be given the benefit of the uncertainty created by their own negligent conduct. To hold otherwise would in effect allow care providers to evade liability for their negligent actions or inactions in situation in which patients would not necessarily have survived or recovered, but still had a significant chance of survival or recovery."
>
> 11. As to the appropriate measure of damages in increased risk of harm cases, this court finds the arguments of Dr. Washington in his Post–Trial Brief and the reasoning of the Oklahoma Supreme Court in *McKellips, Id.,* persuasive,
>
> > "... statistical evidence combined with evidence linking the probabilities to the patient in the case should be considered by the jury in apportioning damages." *McKellips,* supra, at 475.
>
> 12. The *McKellips* court set forth the procedure to be used in calculating the amount of damages recoverable under this theory:
>
> > "The amount of damages recoverable is equal to the percent of chance lost multiplied by the total amount of damages which are ordinarily allowed in a wrongful death action. After consideration of the statistical evidence of the original and diminished chance of survival presented by both sides as well as other factors which are peculiar to the individual decedent, the jury should select from the figures presented or choose appropriated figures to find the percentage of original diminished chance resulting from the

defendant's negligence in order to determine the net reduced figure. The percentages and net reduced figure should be found and added by the jury through a general verdict. [Citations omitted] The trial court should then multiply the total amount of damages by the new reduced figure to determine the final damage award." *McKellips*, supra at 476–77.

13. Mr. Smith had a 50% chance of maintaining vision in his right eye (Dr. Spitzberg's deposition p. 21 lines 1 through 11[) ].

14. Applying thee [sic] law thus stated to the facts of this case, the Plaintiff, James Smith, is entitled to an award against the Defendant, Dr. Wilbert Washington, of an amount equal to 50% of his total damages of $364,037.84 which is $182,018.92.

(R. 24–26).

Consequently, the trial court relied on the *McKellips* case in deciding to reduce Smith's damages by fifty percent (50%). *Id.*

 However, this very issue has been recently decided to the contrary by this court in *Cahoon*, 715 N.E.2d at 8. In *Cahoon*, this court noted that "*Mayhue*, while adopting the § 323 standard, did not address how damages would be measured in such a case." *Id.* Therefore, the defendants in *Cahoon* argued that because *Mayhue* adopted the reasoning of other courts, including *McKellips*, 741 P.2d 467, for the application of § 323, this court should also accept the *McKellips* approach to the reduction of damages. *Id.* We rejected that argument and concluded:

We do not agree that the fact that the supreme court did not describe a method for calculation of damages means that the supreme court intended to adopt a calculation method such as the one set out in *McKellips*. We think it more likely that the supreme court intended to allow for full recovery. *Id.*

The *Cahoon* court reasoned that the *McKellips'* scheme for proportional damages is complicated and would have required further extensive discussion by the supreme court had they intended to adopt such an approach. Further, the *Cahoon* court held that the "language of § 323 plainly states that one is 'liable for the harm' rather than that portion of the risk which was increased." *Id.* Thus, under a § 323 analysis, a plaintiff recovers for the harm suffered, not for the loss of the chance of recovery.[3] Recovery for the harm suffered therefore amounts to recovery for all compensable damages incurred by the plaintiff. Although the *Cahoon* case was a wrongful death case, we believe the decision is equally applicable to an injury case based on medical malpractice. The *Cahoon* court's reasons for allowing full recovery equally apply to an injury case where a plaintiff has suffered a reduced chance of maintaining his eye sight due to a defendant's negligence, as in the case at bar.

Accordingly, under the *Cahoon* decision, Smith is entitled to recover his full damages and the trial court's conclusion of law reducing Smith's damage award by fifty percent (50%) is erroneous.

### 3. *Statute of Limitations*

On cross-appeal, Washington argues that the trial court improperly determined that Smith timely filed his Proposed Complaint. With regard to the statute of limitations issue, the trial court concluded as follows:

6. The doctor/patient relationship between James Smith and Dr. Washington lasted until at least July 9, 1992.

7. James Smith filed his Complaint in this case on October 14, 1993, less than two (2) years after the termination of the doctor/patient relationship

---

**3.** The "loss of chance" doctrine was specifically rejected by the *Mayhue* court and the court instead chose to adopt the § 323 approach. *Id.* at 1389.

between he and Dr. Washington. Therefore, under either the doctrine of "constructive fraud" or the doctrine of "continuing wrong" because James Smith filed his claim within two (2) years of the termination of the doctor/patient relationship between he and Dr. Washington, his Complaint was timely filed and was not barred by the applicable statute of limitations.

8. Alternatively, the court finds that this claim would not be barred by the statute of limitations because to the extent that the medical malpractice statute of limitations begins the running of the two (2) year statute of limitations before an individual such as James Smith would have a reasonable opportunity to discover that he was the victim of malpractice, said statute is unconstitutional as a violation of Indiana Constitution Article 1, Sections 12 and 23.

9. James Smith first became aware of information that would lead a reasonable person to believe that he may have been a victim of medical malpractice on or about January 29, 1993, when he first saw his subsequent treating ophthalmologist, Dr. Daniel Robinson. Therefore, James Smith had until January 29, 1995 within which to file this claim, and his filing on October 14, 1993 of the present claim against Dr. Washington was timely.

(R. 23–24).

Washington asserts three arguments with regard to the trial court's foregoing conclusions. First, Washington argues that the doctor/patient relationship between he and Smith ended on September 28, 1991, and that the trial court's conclu-

sion that the doctor/patient relationship ended as early as July 9, 1992, is clearly erroneous and not supported by the evidence. Because Washington contends that the relationship ended on September 28, 1991, and Smith's Proposed Complaint was not filed until October 14, 1993, he argues that the complaint was untimely under the applicable statute of limitations.

Secondly, Washington asserts that neither the doctrine of "continuing wrong" nor the doctrine of "constructive fraud" are applicable to this case because no evidence was presented to support either theory.

Finally, Washington contends that the trial court's conclusion that the two-year statute of limitations was unconstitutional as applied to an individual such as Smith was erroneous because it was unsupported by the evidence and was based on a vacated Court of Appeals decision.[4]

Ind.Code § 34–18–7–1(b), formally Ind. Code § 27–12–7–1, provides a two-year statute of limitations in medical malpractice actions as follows:

A claim, whether in contract or tort, may not be brought against a health care provider based upon professional services or health care that was provided or that should have been provided unless the claim is filed within two (2) years after the date of the alleged act, omission, or neglect, except that a minor less than six (6) years of age has until the minor's eighth birthday to file.

However, under the "continuing wrong" doctrine, where the malpractice involves an entire course of conduct, including the failure to make a proper diagnosis and properly treat a condition,

---

4. Washington complains that the trial court improperly relied on our decision in *Martin v. Richey*, 674 N.E.2d 1015 (Ind.Ct.App.1997), in addressing the constitutionality of the medical malpractice statute of limitations, because the Indiana Supreme Court had granted transfer and the Court of Appeals decision was vacated at the time the trial court issued its judgment. However, since this case at bar was fully briefed by the parties, the Indiana Supreme Court issued its opinion in the *Martin* case. *Martin v. Richey*, 711 N.E.2d 1273 (Ind.1999). Our Supreme Court agreed with the result reached by the Court of Appeals and held that Ind.Code § 34–18–7–1(b), the medical malpractice statute of limitations, is unconstitutional under Article I, §§ 12 and 23 of the Indiana Constitution as applied to Martin. *Id.*

the statute of limitations is tolled until the wrongful act ceases. *LeBrun v. Conner*, 702 N.E.2d 754, 758 (Ind.Ct.App.1998). In *LeBrun*, we held that an optometrist's alleged continuing wrong in failing to diagnose and monitor a patient's glaucoma ceased, and the statute of limitations on a malpractice claim commenced, on the last date the optometrist treated the patient. *Id.* at 756, 758.

Under the "fraudulent concealment" theory, the statute of limitation is tolled and the defendant is estopped from asserting a statute of limitations defense, where by deception or violation of duty, the defendant conceals material facts from the plaintiff to prevent discovery of the wrongful action. *Umolu v. Rosolik*, 666 N.E.2d 450, 453 (Ind.Ct.App.1996), *reh'g denied.*

Washington asserts that the doctor/patient relationship ended on September 28, 1991, because that was the last appointment noted in his medical records for Smith. However, the trial court concluded that Washington had failed to keep legible and complete medical records for Smith, including the failure to record appointments. (R. 18–19). Furthermore, the trial court's determination that the doctor/patient relationship between Smith and Washington lasted until at least July 9, 1992, is supported by the testimony of pharmacist Harold Chavous (Chavous). Chavous testified that Washington prescribed the medication "Motrin" for Smith either orally or in writing some time between July 9, 1992, and July 9, 1993. He further testified that he knew this because on July 9, 1993, Smith obtained a refill of this prescription from Chavous' pharmacy and that he would not have filled a prescription that was over one (1) year old. The evidence also showed that Washington had prescribed Motrin for Smith to help control the pain associated with the high intraocular pressure in his right eye.

Because the reasonable inferences from this evidence supports the finding that Washington was still treating Smith's glaucoma after July 9, 1992, the trial court's conclusions that the doctor/patient relationship ended as early as July 9, 1992, and that Smith's Proposed Complaint was timely filed on October 14, 1993, were not erroneous. As we have determined that Smith's complaint was timely filed, we do not need to address Washington's other arguments with regard to the statute of limitations.

### 4. *Request for Jury Trial*

On cross-appeal Washington argues that the trial court improperly denied his belated request for a jury trial. Article I, § 20 of the Indiana Constitution guarantees that "[i]n all civil cases, the right of trial by jury shall remain inviolate." However, "[t]his constitutional right is not absolute and may be waived." *Hamlin v. Sourwine*, 666 N.E.2d 404, 408 (Ind.Ct.App.1996). In a civil case, a demand for a jury trial must be made by the requesting party no later than ten (10) days after the first responsive pleading is due. Ind.Trial Rule 38(B). This ten-day period applies whether the responsive pleading is mandatory or merely permissive. T.R. 38(B);*Weber v. Costin*, 654 N.E.2d 1130, 1135 (Ind.Ct.App.1995). Consequently, the failure of a party to serve a demand as required by T.R. 38(B) constitutes a waiver of the party's right to a trial by jury. *Id.* Furthermore, T.R. 38(D) provides that the trial court *shall not* grant an untimely demand for a jury trial except upon the written agreement of all the parties to the action. T.R. 38(D) (emphasis added).

Here, Smith's Proposed Complaint was filed with the Indiana Department of Insurance on October 14, 1993. Subsequently, on March 29, 1995, Smith's Complaint was filed in the trial court and Washington's Answer was filed on May 30, 1995. Thus, pursuant to T.R. 38(B), Washington's request for a jury trial should have been filed by June 9, 1995. However, Washington did not request a jury trial until October 3, 1997, over two

years after the request was due, and only eleven days before the scheduled bench trial.[5] This Court has affirmed the denial of an untimely request for jury trial filed four days late. *State Farm Auto. Ins. Co. v. James,* 562 N.E.2d 777, 780 (Ind.Ct.App. 1990). Certainly a two (2) year delay is unacceptable.

Additionally, there was no showing that there was an agreement between the parties, written or otherwise, as to Washington's belated jury trial request. Absent such an agreement, T.R. 38(D) dictates that the trial court shall not grant an untimely jury demand.

 Washington also asserts that the trial court abused its discretion in not reinstating his jury trial request based on Ind. Trial Rule 6(B)(2). This rule allows trial courts to permit certain acts to be done after the date required if the failure to act was the result of excusable neglect. T.R. 6(B)(2). However, Washington has made no showing of excusable neglect. Washington claims that he wanted a jury trial in this matter but his prior counsel, without consulting him, deliberately failed to request a jury trial.[6] Even if this allegation is true, Washington is held to the actions of his counsel. *Parker v. State,* 676 N.E.2d 1083, 1086 (Ind.Ct.App.1997). "The general rule is that a client is bound by his attorney's actions in civil proceedings." *Id.; see also Koval v. Simon Telelect, Inc.,* 693 N.E.2d 1299, 1301–1302 (Ind. 1998) ("[U]nder longstanding Indiana authority, retention does equip an attorney with the inherent power to bind a client to the results of a procedure in court.... Decisions relating to trial tactics for example—when to object, what motions to file, which arguments to present—or how to negotiate are left to the attorney.")

Moreover, Washington's present counsel filed his Appearance on April 17, 1997, but did not request a jury trial until almost six months later on October 3, 1997. Consequently, Washington is bound by his counsels' decision not to present a timely request for a jury trial. Therefore, we conclude that Washington's claims with regard to his request for a jury trial are wholly without merit and accordingly, we find that the trial court properly denied Washington's untimely jury trial request.

### 5. *Contributory Negligence*

Washington next raises the issue of Smith's contributory negligence and asserts on cross-appeal that the trial court's conclusion that Smith was not negligent was clearly erroneous. In the trial court's conclusion of law number 5, the trial court determined that: "The defendant failed to prove by a preponderance of the evidence that any non-compliance or contributory negligence on the part of James Smith was a proximate cause of any of the damages sustained by James Smith in this case." (R. 23).

 "The general rule on the issue of the plaintiff's contributory negligence is that the plaintiff must exercise that degree of care that an ordinary reasonable man would exercise in like or similar circum-

**5.** Washington has not provided us with a copy of the hearing transcript from the October 3, 1997 hearing where he apparently presented his oral request for a jury trial. Further, no written request for a jury trial was found in the Supplemental Record of Proceedings. However, Washington has included in the Supplemental Record of Proceedings his "Petition for Certification for Interlocutory Appeal of Denial of Jury Trial Request" which was filed in the trial court on October 10, 1997. (S.R.663). In that Petition, Washington asserts that he had made an oral motion for jury trial on October 3, 1997, which was denied. Smith does not contest that Wash-

ington made an oral request for a jury trial on October 3, 1997, so we will assume that the oral request was made although the hearing transcript was not included in the Record of Proceedings or the Supplemental Record of Proceedings.

**6.** Washington's other argument, presented to the trial court, that he was deliberately denied his request for a jury trial due to a "Jewish conspiracy" between his prior counsel, opposing counsel, and members of the Medical Review Panel, is wholly without merit and unworthy of further comment.

stances." *Smith v. Hull,* 659 N.E.2d 185, 191 (Ind.Ct.App.1995) (citation omitted). Contributory negligence is conduct on the part of the plaintiff which falls below the standard to which he is required to conform for his own protection and contributes as a legal cause to the harm he has suffered. *Id.*

■ Washington argues that the evidence at trial showed that on occasion Smith ran out of his prescribed medication and that Smith discontinued his medication seven to eight months prior to seeing Dr. Robinson on January 29, 1993. Washington also argues that Smith was advised to have surgery but opted to delay surgery because he could not afford it. Washington contends that Smith's failure to have surgery and/or his failure to take the prescribed medication to control the intraocular pressure in his right eye may have caused his loss of vision.

Smith responds that the evidence showed that he did everything he could possibly do to treat his glaucoma. Further, Smith asserts that Doctors Spitzberg and Boeglin, of the Medical Review Panel, noted that there was no documentation in Washington's records that Smith was noncompliant or that Washington was having difficulty treating him. Smith testified that he filled the prescriptions given to him by Washington or he was provided with medication samples to use, and that he used the prescribed medication unless Washington instructed him to discontinue the medication. Further, Smith testified that he never missed an appointment with Washington and that he saw Washington over fifty times. Smith also testified that he never refused any treatment suggested by Washington, that he never refused surgery, and that both times Washington suggested surgery, he had the procedure done. Smith denied he was advised by Washington to have a third surgery.

Moreover, Washington's testimony was equivocal with regard to whether he specifically told Smith that he needed further surgery. Washington testified in part as follows:

Q. What surgery did you advise Mr. Smith that he should have on that date?

A. I don't know if I sit [sic] down and discussed it with Smith, the different kinds of surgery....

Q. Did you have a specific one in mind for Mr. Smith when you advised surgery?

A. Truthfully, I can't say what I didn't do and would have gone through back there then [sic]....

Q. Sir I understand. But my question is: Did you tell him if he didn't have whatever surgery you were going to perform that he could lose the vision perhaps in his right eye?

A. I might and might not....

Q. Did Mr. Smith indicate to you on the 24th of September why he did not want to have surgery?

A. I do not know. I do not remember. All I know, it didn't happen.

(S.R.1159).

At best, there is a conflict between Washington's testimony and Smith's testimony with regard to whether Smith was noncompliant. Furthermore, all of the experts agreed, that advising a patient to have surgery without explaining the risks and benefits of having or not having the surgery was below the standard of care required of Washington. Essentially, Washington requests this court to reweigh the conflicting evidence to find that Smith was contributorily negligent. However, our review is limited to the evidence presented at trial and the reasonable inferences to be drawn therefrom that supports the trial court's conclusion. *City of Muncie v. Lowe,* 705 N.E.2d at 530.

Therefore, the trial court's finding of fact number 56 that: "James Smith exercised the care expected of a reasonably prudent person during his doctor/patient relationship with Dr. Washington;" (R. 22), is supported by the evidence and the reasonable inferences therefrom. This finding supports the trial court's conclusion that Smith was not contributorily negli-

gent. Thus, we find that the trial court did not erroneously conclude that Smith was not contributorily negligent.

### CONCLUSION

Based on the foregoing, we reverse the trial court's conclusion of law reducing Smith's judgment by fifty percent (50%) and reverse and remand with instructions to reinstate the full damage award in Smith's favor in the amount that was determined by the trial court of $364,037.84. Further, we affirm the trial court's conclusion that the case was timely filed within the applicable statute of limitations, the trial court's denial of Washington's belated request for jury trial, and its conclusion that Smith was not contributorily negligent.

Reversed in part, affirmed in part.

MATTINGLY, J., concurs.

SULLIVAN, J., concurs in part and dissents in part with opinion.

SULLIVAN, Judge, concurring in part and dissenting in part

I concur with respect to Parts 1, 3, 4, and 5 of the majority opinion. For the reasons set forth in my dissenting opinion in *Cahoon v. Cummings* (1999) Ind.App., 715 N.E.2d 1, I respectfully dissent with respect to Part 2.