Stephen W. **ROBERTSON**, Indiana Commissioner of Insurance, as Administrator of the Indiana Patient's Compensation Fund and the Indiana Patient's Compensation Fund, Appellants–Respondents,

v.

**B.O.**, a minor, by his parents and next friends, Lisa A. **ORT** and Kevin C. Ort, Appellee–Plaintiff.

No. 49A04–1009–CT–528.

Court of Appeals of Indiana.

May 23, 2011.

Susan E. Cline, Lewis Wagner, LLP, Indianapolis, IN, Attorney for Appellant.

Robert L. Thompson, Fort Wayne, IN, Richard L. Schultheis, Indianapolis, IN, Attorneys for Appellee.

Libby Y. Goodknight, Krieg DeVault LLP, Indianapolis, IN, Attorney for Amicus Curiae Indiana State Medical Association.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellants–Respondents, Stephen W. Robertson,[1] Indiana Commissioner of Insurance, as Administrator of the Indiana Patient's Compensation Fund, and the Indiana Patients' Compensation Fund (collectively, the Fund), appeal the trial court's partial summary judgment with respect to the compensable damages in favor of Appellee–Plaintiff, B.O., a minor, by his parents and next friends, Lisa A. Ort and Kevin C. Ort (collectively, B.O.).

We reverse and remand for further proceedings.

### ISSUE

The Fund presents three issues on appeal, which we consolidate and restate as the following single issue: Whether the Fund can introduce evidence concerning the existence and compensable nature of B.O.'s damages after B.O. entered into a settlement with the healthcare provider settling his claim of medical malpractice.

### FACTS AND PROCEDURAL HISTORY

On February 19, 2004, B.O. filed an amended proposed complaint with the

1. On February 3, 2011, we granted Appellant's Motion for Substitution of Public Officer as a Party to this Action, substituting Carol Cutter with Stephen W. Robertson, the current Commissioner of the Indiana Department of Insurance and Administrator of the Indiana Patient's Compensation Fund.

Indiana Department of Insurance pursuant to the Indiana Medical Malpractice Act (MMA), Ind.Code § 34–18–1–1 *et seq.* The complaint alleged negligence committed by Lutheran Hospital of Indiana, Inc. (Lutheran) during the labor and delivery of B.O. on February 6 and 7, 1997. B.O. claimed that Lutheran failed to adequately monitor his condition and timely respond to persistent changes in his fetal heart rate, indicating fetal distress. B.O. was not diagnosed with any abnormalities after his birth or during the first years of his life. At age four, B.O. was diagnosed with spastic diplegia,[2] a mild form of cerebral palsy. In his complaint, he alleged that the spastic diplegia is the result of the negligence that occurred during his birth. The parties to the underlying action completed the administrative requirements of the MMA and presented the matter to a medical review panel, which determined that Lutheran had failed to meet the appropriate standard of care, but the "conduct complained of was not a factor of the resultant damages." (Appellant's App. p. 73). In October 2006, Lutheran settled with B.O. under an agreement that permitted access to the Fund.[3]

On June 7, 2007, B.O. filed the instant action against the Fund, seeking the statutory maximum of $650,000 in excess damages. On May 15, 2008, the Fund filed its disclosure of expert witnesses, identifying four medical witnesses who had opined that either B.O. did not have spastic diplegia, or that if he did, it was not consistent with cerebral palsy that occurred as a result of a birth injury. Thereafter, on June 16, 2008, the Fund identified a fifth expert witness who concurred that B.O.'s condition is not due to an insult that took place during labor and delivery.

On July 15, 2008, B.O. filed a motion for partial summary judgment seeking a preliminary determination that when computing compensable damages resulting from the negligence of a healthcare provider, the Fund may not contend or offer testimony establishing that B.O. did not incur the damages or that the damages were not caused by the conduct of the healthcare provider. In other words, B.O. sought a clarification as to the evidence that would be properly admissible pursuant to I.C. § 34–18–15–3. On August 18, 2008, the Fund filed its memorandum and designation of evidence in opposition to B.O.'s motion for partial summary judgment. On September 18, 2008, during a pretrial conference, the parties requested the instant matter stayed until the Indiana Supreme Court issued its decision in *Atterholt v. Herbst,* 902 N.E.2d 220, 222 (Ind.2009), *clarified on reh'g,* 907 N.E.2d 528 (Ind.

2. Spastic diplegia is a form of cerebral palsy that mostly affects the lower extremities making it difficult to walk due to muscle tightness in the hips and legs, causing the legs to turn inward and cross at the knees. This results in stiff and awkward moving legs, causing a characteristic walking rhythm known as the scissors gait. http://www.cerebralpalsysource.com/Type_of_CP/spastic_diplegia/index.html (last visited April 15, 2011).

3. Under the Indiana Medical Malpractice Act, the total current recovery in a medical malpractice action is limited to $1,250,000 per injury or death. The Act caps a health care provider's malpractice liability at $250,000 per occurrence if the provider maintains sufficient insurance and pays the required surcharge to the Fund. I.C. §§ 34–18–3–1, –14–3(b). However, the events of this claim occurred in February 1996, therefore, the applicable statutory damages cap applicable to the instant claim is $750,000, $100,000 of which is required to be paid by the underlying healthcare provider, with any amount of the remaining $650,000 paid by the Fund. If the Fund and the claimant cannot agree on the amount to be paid from the Fund, the trial court must hold a hearing to determine the amount for which the Fund is liable. I.C. § 34–18–15–3(4)–(5).

2009). The supreme court published its opinion in *Herbst* on March 10, 2009. Thereafter, on November 12, 2009, B.O. tendered his supplemental memorandum in support of his motion for partial summary judgment, and the Fund subsequently filed its own supplemental memorandum in opposition.

On April 30, 2010, the trial court conducted a hearing on B.O.'s motion for partial summary judgment. On June 14, 2010, the trial court issued its partial summary judgment in favor of B.O. concluding that the testimony of the Fund's expert witnesses could not be properly offered. One month later, the Fund filed its motion for certification of interlocutory appeal, which the trial court granted. On October 15, 2010, we accepted jurisdiction of this appeal pursuant to Indiana Appellate Rule 14(B). On January 16, 2011, the Indiana State Medical Association filed as *Amicus Curiae for the Fund.*

Additional facts will be provided as necessary.

### DISCUSSION AND DECISION

### I. *Standard of Review*

Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C). In reviewing a trial court's ruling on summary judgment, this court stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *First Farmers Bank & Trust Co. v. Whorley*, 891 N.E.2d 604, 607 (Ind. Ct.App.2008), *trans. denied.* Thus, on appeal, we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. *Id.* at 607–08. In doing so, we consider all of the designated evidence in the light most favorable to the non-moving party. *Id.* at 608. The party appealing the grant of summary judgment has the burden of persuading this court that the trial court's ruling was improper. *Id.* When the defendant is the moving party, the defendant must show that the undisputed facts negate at least one element of the plaintiff's cause of action or that the defendant has a factually unchallenged affirmative defense that bars the plaintiffs' claim. *Id.* Accordingly, the grant of summary judgment must be reversed if the record discloses an incorrect application of the law to the facts. *Id.*

### II. *Analysis*

The Indiana Medical Malpractice Act allows a patient or the representative of a patient to bring a malpractice claim for bodily injury or death. *Atterholt v. Robinson,* 872 N.E.2d 633, 639 (Ind.Ct. App.2007). Where, as here, the act of malpractice occurred before June 30, 1999, the MMA provides that the total amount recoverable for any injury to or death of a patient may not exceed $750,000. *See* I.C. § 16–9.5–4–3 (1999). A qualified healthcare provider is liable only for the initial $100,000 of damages, with the excess damages to be paid by the Fund limited to $650,000. *See id.* In the present case, B.O. seeks the maximum amount of allowable excess damages from the Fund following its settlement agreement with Lutheran.

Indiana Code section 34–18–15–3 controls in situations where a healthcare provider or its insurer agree to settle the provider's liability on a claim by payment of its policy limits but the claimant is demanding damages in excess of this amount. In such cases, the statute provides, in pertinent part:

(5) At the hearing, the commissioner, the claimant, the health care provider, and the insurer of the health care pro-

vider may introduce relevant evidence to enable the court to determine whether or not the petition should be approved if the evidence is submitted on agreement without objections. If the commissioner, the health care provider, the insurer of the health care provider, and the claimant cannot agree on the amount, if any, to be paid out of the patient's compensation fund, the court shall, after hearing any relevant evidence on the issue of the claimant's damage submitted by any of the parties described in this section, determine the amount of claimant's damages, if any, in excess [of the sum] already paid by the insurer of the health care provider. The court shall determine the amount for which the fund is liable and make a finding and judgment accordingly. *In approving a settlement or determining the amount, if any, to be paid from the patient's compensation fund, the court shall consider the liability of the health care provider as admitted and established.*

I.C. § 34–18–15–3(5) (emphasis added).

In this case, B.O. filed a petition to access the Fund after settling with Lutheran. B.O. and the Fund now dispute the evidence that can be properly admitted to determine the amount of excess damages, if any, for which the Fund is statutorily responsible. The Fund posits that the summary judgment prohibiting the introduction of its expert witnesses results in curtailing the Fund's ability to present evidence to assist the trier of fact in determining the proper measure of damages, if any, to be awarded to B.O. Specifically, the Fund attempts to introduce five expert witnesses who intend to testify that the circumstances surrounding B.O.'s mother's labor and B.O.'s birth do not support a subsequent diagnosis of spastic diplegia at age four. The experts concurred that B.O.'s leg spasticity is not due to an insult during labor and delivery and at birth,

B.O. did not exhibit symptoms consistent with a neurological injury such as cerebral palsy. Based on these testimonies, the Fund contends that B.O. is not entitled to any excess damages. The Indiana State Medical Association favors the Fund's arguments and advances that the trial court's summary judgment will have a significant financial impact on the Fund and its participating health care providers. In turn, B.O. counters that because Lutheran settled the underlying cause, the Fund, by operation of the statute, cannot argue liability or causation and may only argue the amount of damages. Therefore, B.O. maintains that the admission of the testimony by the Fund's experts is improper as it impermissibly encroaches on Lutheran's liability, which is already established.

Presented as such, we are asked to determine whether the Fund's argument is a permissible argument regarding the legally compensable nature of the damages sought, a permissible argument about the amount of damages owed to B.O., or an impermissible argument regarding the ultimate question of liability. While precedent exists as to various components of this issue, the precise question to be addressed by this court is a matter of first impression.

In interpreting I.C. § 34–18–15–3, the trial court relied on our opinion in *Dillon v. Glover*, 597 N.E.2d 971 (Ind.Ct.App. 1992), *trans. denied*, which imposed the prevailing interpretation of the statute at hand. In *Glover*, a physician negligently failed to diagnose the plaintiff's lung cancer from an initial x-ray, and the patient died. *Id.* at 972. The patient's estate brought a wrongful death claim against the physician. *Id.* After settling with the physician for the statutory maximum, the estate then pursued excess damages from the Fund. *Id.* At the hearing on excess

damages, evidence established that had the cancer been diagnosed properly, the patient would have had a thirty percent chance to live five years, rather than the eight percent chance he had when the cancer was actually diagnosed. *Id.* The Fund argued that because the patient never had a greater than fifty percent chance of survival, the physician did not proximately cause the patient's death, and the patient's estate was not entitled to any excess damages. *Id.*

On appeal, we noted that I.C. § 16–9.5–4–3, the predecessor of I.C. § 34–18–15–3 that contained the same statutory language emphasized above, "is unambiguous, in fact it could be characterized as a paragon of clarity." *Id.* at 973. Because of this clarity, we held that

> [t]he Fund would equate settlement with an admission of negligence, and claims that the issue of whether the health care provider's negligence proximately caused any damage is properly considered by the trial court. The Statute, however, speaks of settling a health care provider's *liability* and provides that the trial court will consider the *liability* of the health care provider as admitted and established.

*Id.* We continued our analysis by concluding that "[i]t is axiomatic that, before liability can be imposed, there must be proof that the defendant's negligence *proximately caused* the plaintiff's harm. It therefore follows that once *liability* is established, the issue of *proximate cause* is decided." *Id.* However, we advised that the Fund remained free to argue the correct standard of compensation of the injury. *Id.* at 973–74. The issue presented here—the content of admissible evidence to establish the measure of damages—was thus not addressed.

Cases decided since *Glover* have generally affirmed the distinction made therein:

upon a petition for excess damages from the Fund following a settlement between the claimant and the defendant health care providers, the trial court may not inquire whether the provider was liable for damages, but the court may determine the amount of damages owing to the claimant and may also evaluate the compensable *nature* of the damages sought by the claimant. *See, e.g., Rimert v. Mortell,* 680 N.E.2d 867, 871 (Ind.Ct.App.1997), *trans. denied; J.L. v. Mortell,* 633 N.E.2d 300, 303–04 (Ind.Ct.App.1994), *trans. denied, Dillon v. Callaway,* 609 N.E.2d 424, 426 (Ind.Ct.App.1993), *trans. denied.*

Applying this line of precedents, B.O.'s damages *per se, i.e.,* physical injuries as a result of medical malpractice, fall within the purview of statutory compensable damages. However, the evidence the Fund proposes to admit also squarely focuses on Lutheran's liability issue, positing that B.O.'s spastic diplegia either did not result from any medical malpractice committed by Lutheran during B.O.'s birth or is non-existent. Based on the statutory interpretation of I.C. § 34–18–15–3, as proponed by *Glover,* this evidence would be inadmissible.

Nevertheless, very recently, in the re-evaluation of *Glover* and its progeny in *Atterholt v. Herbst,* 902 N.E.2d 220 (Ind. 2009), *reh'g granted,* 907 N.E.2d 528 (Ind. 2009), our supreme court provided us with clear and different guidelines to settle the issue before us today. *Herbst* involved proportional damages pursuant to the Restatement (Second) of Torts, § 323, and turned on the degree of initial risk that is aggravated by the medical malpractice, rather than a demand for full damages. In *Herbst,* a patient's physician misdiagnosed fulminant myocarditis as pneumonia, and the patient died. *Id.* at 221. The patient's estate sued the doctor and others for medical malpractice resulting in wrong-

ful death. *Id.* After settling, the estate filed an action against the Fund, seeking the maximum in excess damages. *Id.* At trial, the trial court excluded evidence tendered by the Fund that appeared to establish that even with proper care, the patient had less than a ten percent chance of surviving the myocarditis. *Id.* at 222. On appeal, we affirmed the trial court's exclusion of the evidence. *Id.*

Our supreme court reversed, holding that

> when a claimant seeks excess damages from the [Fund] after obtaining a judgment or settlement from a health care provider in a medical malpractice case, the Fund may introduce evidence of the claimant's preexisting risk of harm if it is relevant to establish the amount of damages, *even if it is also relevant to liability issues that are foreclosed by the judgment or settlement.*

*Id.* at 221 (emphasis added); *see also opinion on reh'g,* 907 N.E.2d at 528. Commencing its analysis, the *Herbst* court noted our decision in *Glover* where we held that evidence concerning the health care provider's negligence was impermissible as "the settlement established liability, which included the issue of whether the physician's negligence proximately caused the patient's damages." *Herbst,* 902 N.E.2d at 223. Because *Glover* concluded that the Fund was free to argue regarding the correct standard for compensation of the injury, the *Herbst* court noted that, as such, *Glover* did not address the "extent of damages." *Id.*

Continuing its analysis, the supreme court clarified that the issue left open in *Glover* was decided in *Mayhue v. Sparkman,* 653 N.E.2d 1384 (Ind.1995). *Id.* Adopting Section 323 of the Restatement (Second) of Torts, the court explained that when a plaintiff proves negligence and an increase in the risk of harm due to the medical malpractice, the jury is permitted to decide whether the malpractice was a substantial factor in causing the harm suffered by the plaintiff. *Id.* As such, in a *Mayhue* claim, evidence of harm is relevant to establish the health care provider's liability.

Noting that the *Mayhue* holding was consistent with *Glover,* the *Herbst* court stated that although the Fund in *Glover* was precluded from challenging liability, it was free to contest the trial court's finding as to damages, presumably by offering evidence of the patient's underlying risk of harm. *Id.* The court concluded that "[r]elevance is not an either-or proposition. Evidence of increased risk of harm can be relevant to both causation under *Mayhue* and valuation of damages." *Id.* at 224.

Although B.O. does not bring a claim of proportional damages before us, but rather requests full damages, we find the supreme court's holding in *Herbst* persuasive and applicable to the instant cause. While pursuant to I.C. § 34–18–15–3, Lutheran's liability and proximate causation are deemed established by the underlying settlement with B.O., the extent of the excess damages is still before us and contested by the Fund. Based on the recent developments in the case law, it follows logically that evidence of the extent of this injury which is sought to be recovered from the Fund is properly admissible before the trial court.

■ Our holding today is in line with the plain and unambiguous language of Indiana Code section 34–18–15–3, which allows each injured person to obtain excess damages to cover the costs of his or her injury while limiting the amount of damages that a health care provider may have to pay. Thus, the statute does not compel malpractice insurance carriers to factor in additional unpredictable costs that would

be incurred if the statutory cap were tied to possible multiple injuries resulting from an occurrence of malpractice. *McCarty v. Sanders*, 805 N.E.2d 894, 899 (Ind.Ct.App. 2004). Accordingly, the statute achieves the twin goals of the MMA: compensating those injured by malpractice while at the same time assuring that malpractice insurance will remain available to health care providers. *See id.*

An award of excess damages by the Fund is not automatic and the statute appears to recognize the potential for no excess damages following settlement with the health care provider. Specifically, the language of the statute itself directs the trial court to determine "the amount, if any," to be paid from the Fund. *See* I.C. § 34–18–15–3. As the supreme court observed in *Herbst*, if the claimant would have died regardless of the treatment he received, "although causation in fact is no longer in issue, the damages would be zero because the negligent act increased the probability of death [or injury] by zero percent." *Herbst*, 902 N.E.2d at 224.

█ Health care providers in Indiana may settle medical malpractice claims for a multitude of reasons, like concerns over the complexity of the case that might make it difficult for a jury to understand the issues, the weaknesses in a case that may be raised by members of the medical review panel notwithstanding a favorable opinion, and the relative cost of defending a medical malpractice claim through extensive scientific, medical, and other expert testimony. The admission of liability and acceptance of proximate cause by way of a settlement between the claimant and the health care provider does not obligate the Fund to compensate claimants for damages that are of a non-compensable nature. *See Dillon*, 597 N.E.2d at 973. As such, the Fund cannot be precluded from introducing relevant evidence on the compensa-

ble nature and event of a claimant's injury merely because the health care provider elected to settle the underlying medical malpractice claim and liability has been established by operation of I.C. § 34–18–15–3. Holding otherwise would force health care providers to litigate the compensable nature and extent of the alleged injury in the underlying action or forfeit the Fund's ability to present such evidence in calculating the amount of excess damages, if any, recoverable in the secondary action against the Fund. Therefore, we reverse the trial court and conclude that, here, the Fund can present evidence allegedly establishing that B.O. does not have spastic diplegia or that his symptoms are not due to an insult at birth.

### CONCLUSION

Based on the foregoing, we conclude that the trial court erred in excluding the Fund's evidence regarding the extent of B.O.'s damages.

Reversed and remanded for further proceedings.

DARDEN, J., and BARNES, J., concur.