Jim ATTERHOLT, Commissioner of the Indiana Department of Insurance, as Administrator of the Indiana Patient's Compensation Fund, Appellant–Defendant,

v.

Geneva HERBST, Personal Representative of the Estate of Jeffrey A. Herbst, deceased, Appellee–Plaintiff.

No. 49A04–0702–CV–106.

Court of Appeals of Indiana.

Feb. 4, 2008.

Elizabeth H. Knotts, Rori L. Goldman, Hill Fulwider McDowell Funk & Matthews, Indianapolis, IN, Attorneys for Appellant.

Robert L. Thompson, Thompson & Rogers, Fort Wayne, Richard ·L. Schultheis, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MATHIAS, Judge.

Geneva Herbst, the personal representative of the Estate of Jeffrey A. Herbst ("the Estate") brought an action seeking excess damages from the Indiana Patient's Compensation Fund ("the Fund"). The Marion Superior Court granted partial summary judgment and final judgment in favor of the Estate. The Fund appeals and presents two issues for review, which we restate as: whether the trial court erred in granting partial summary judgment in favor of the Estate, and whether the trial court erred in excluding evidence proffered by the Fund.

We affirm.

### Facts and Procedural History

The facts necessary to the resolution of the present case are substantially undisputed. On March 4, 2002, Jeffrey Herbst ("Jeffrey") went to his primary care physician, Dr. Michael Mohrman, complaining of numbness and tingling in his hands, which Dr. Mohrman diagnosed as carpal tunnel syndrome. Two days later, Jeffrey went back to Dr. Mohrman, complaining of fever, congestion, nausea, loss of appetite, and decreased urine output. Dr. Mohrman diagnosed Jeffrey with pneumonia and sent him to Lutheran Hospital. When Jeffrey was admitted to the hospital, he was in "cardiogenic shock," with very low blood pressure, tachycardia, low oxygen, pain, and nausea. Jeffrey's conditioned deteriorated throughout the day: at 7:45 p.m. he was in acute respiratory distress, his heart stopped at 8:20 p.m., and he was pronounced dead at 9:00 p.m.

The Estate brought a medical malpractice claim against Dr. Mohrman, his employer Brooklyn Medical Associates, P.C., and Lutheran Hospital (collectively "the Healthcare Providers") for the wrongful death of Jeffrey. The medical review panel concluded that Dr. Mohrman failed to comply with the appropriate standard of care, but that his conduct did not cause Jeffrey's death. The medical review panel also concluded that Lutheran Hospital did not fail to comply with the appropriate standard of care. After the panel issued its opinion, the Estate settled its claim with the Healthcare Providers for $187,001.

On November 22, 2005, the Estate filed a petition for damages from the Fund, asking for $1,000,000 in excess damages stemming from Jeffrey's death. On March 16, 2006, the Estate moved for summary judgment, seeking a preliminary determination from the trial court that it would consider only the amount of damages owing to the Estate and would not consider whether the Healthcare Providers were liable for damages. The Estate argued that the Fund was statutorily prohibited from arguing the issues of liability or proximate cause in light of the settlement between the Estate and the Healthcare Providers. The Fund countered that it should be allowed to offer evidence pertinent to the issue of the increased risk of injury or death attributable to the Healthcare Providers' acts. In other words, the Fund wished to argue that any recovery by the Estate should be based upon the chance for survival lost by Jeffrey as a result of the Healthcare Providers' negligence. On June 5, 2006, the trial court granted summary judgment on this issue in favor of the Estate. The Fund brought a motion for a discretionary interlocutory appeal of this ruling, but the trial court denied the motion.

■ The case proceeded to a bench trial held on October 24, 2006. The Fund sought to introduce the deposition of its expert witness, Dr. Michael Mirro, who would have testified that Jeffrey would not have survived hospitalization, that Jeffrey had less than a ten percent chance of surviving his hospitalization even absent any negligence on the part of the Healthcare Providers, and that it was unlikely that Jeffrey, had he survived, would have been able to return to work. The trial court excluded this evidence. On January 22, 2007, the trial court entered judgment in favor of the Estate in the amount of $1,000,000. The Fund now appeals.[1]

### Discussion and Decision

Here, the Fund contends that it should have been allowed to argue that Jeffrey had little chance of survival even absent any malpractice on the part of the Healthcare Providers, and that the trial court's grant of partial summary judgment in favor of the Estate on this issue was erroneous. The Estate counters that because the Healthcare Providers settled with the Estate, the Fund, by operation of statute, cannot argue liability or causation and may only argue the amount of damages. The resolution of this question involves the intersection of two lines of cases and corresponding rules of law. Before delving into this, we first look at some general provisions providing the background of this case.

### I. The Medical Malpractice Act

■ The Indiana Medical Malpractice Act ("MMA") allows a patient or the representative of a patient to bring a malpractice claim for bodily injury or death. *Atterholt v. Robinson*, 872 N.E.2d 633, 639 (Ind.Ct.App.2007). The MMA provides that, for an act of malpractice occurring after June 30, 1999, the total amount recoverable for any injury to or death of a patient may not exceed $1,250,000. *Id.* at 640 (citing Ind.Code § 34–18–14–3(a)(3) (1999)). A "qualified health care provider" is liable only for the initial $250,000 of damages, and the remainder of the judgment or settlement amount shall be paid from the Fund. *Id.* (citing I.C. § 34–18–14–3(c)). In the present case, the Estate seeks excess damages from the Fund following its settlement agreement with the Healthcare Providers.

Indiana Code section 34–18–15–3 (1999) controls in situations where a health care provider or its insurer agree to settle the provider's liability on a claim by payment of its policy limits and the claimant is demanding an amount in excess of this amount. In such cases, the statute provides: "In approving a settlement or determining the amount, if any, to be paid from the patient's compensation fund, the court shall consider the liability of the

1. The Estate claims that the first issue presented by the Fund, the propriety of the trial court's grant of partial summary judgment, is an interlocutory issue which is not properly before us following a final judgment. To the contrary, any claim of error in an interlocutory order, even an interlocutory order which is appealable as of right, is not waived for failure to take an interlocutory appeal but instead may be raised on appeal from the final judgment. *Bojrab v. Bojrab*, 810 N.E.2d 1008, 1014 (Ind.2004); *see also Four Seasons Mfg., Inc. v. 1001 Coliseum, LLC*, 870 N.E.2d 494, 501 (Ind.Ct.App.2007) (noting that party who fails to bring interlocutory appeal from denial of motion for summary judgment may still pursue appeal after entry of final judgment because denial of summary judgment simply places parties' rights in abeyance pending ultimate determination by trier of fact). Thus, there is no impediment to the Fund currently challenging the trial court's summary judgment ruling. Moreover, the second issue presented by the Fund, the propriety of the trial court's exclusion of evidence, is dependent upon the same legal question presented in the first issue.

health care provider as admitted and established." I.C. § 34–18–15–3(5).

## II. Glover and Indiana Code Section 34–18–15–3

The meaning of this portion of section 34–18–15–3(5) was addressed in *Dillon v. Glover*, 597 N.E.2d 971 (Ind.Ct.App.1992), *trans. denied.* In *Glover*, the decedent's estate brought a malpractice action against the decedent's health care providers. The estate eventually settled with the providers for $100,000.[2] The estate then petitioned for excess damages from the Fund. At trial, the Fund argued that the healthcare providers had not been the proximate cause of the decedent's death, but the trial court entered judgment in favor of the decedent's estate. Upon appeal, the Fund argued that the settlement between the estate and the providers established only the providers' negligence, that this negligence cost the decedent at most a "chance" at living, and that his death was actually caused by his cancer. Thus, the Fund argued that the estate should receive no recovery.

The *Glover* court rejected the Fund's arguments, noting that Indiana Code section 16–9.5–4–3 (1988), the predecessor statute to Indiana Code section 34–18–15–3, provided that " '[i]n approving a settlement or determining the *amount*, if any, to be paid from the patient's compensation fund, the court shall consider *the liability of the health care provider as admitted and established.*' " *Glover*, 597 N.E.2d at 973. Observing that before liability can be imposed, the defendant must have proximately caused the plaintiff's harm, the court wrote, "once *liability* is established, the issue of proximate cause is decided." *Id.* Thus, "upon a petition for excess damages, the trial court will determine the *amount* of damages, if any, due to the

claimant, not *whether* the provider is liable for damages." *Id.*

In reaching this conclusion, the *Glover* court distinguished the earlier case of *Eakin v. Kumiega*, 567 N.E.2d 150 (Ind.Ct.App.1991), in which the court considered a request for excess damages from the Fund due to the negligent infliction of emotional distress by a healthcare provider. The *Kumiega* court held that the then-applicable version of the "impact rule" precluded the claimant's recovery for emotional damages. *Id.* at 153. The *Glover* court explained that while the claimant in *Kumiega* sought recovery for damages which were not recoverable by law, the claimant in *Glover* sought only damages for the decedent's death, which is a compensable injury. *Glover*, 597 N.E.2d at 973.

Cases since *Glover* have generally followed the distinction made therein: upon a petition for excess damages from the Fund following a settlement between the claimant and the defendant healthcare providers, the trial court may not inquire into whether the provider was liable for damages, but the court may determine the amount of damages owing to the claimant and may also inquire into the compensable nature of the damages sought by the claimant. See, *e.g.*, *Rimert v. Mortell*, 680 N.E.2d 867, 871 (Ind.Ct.App.1997), *trans. denied; J.L. v. Mortell*, 633 N.E.2d 300, 303–04 (Ind.Ct.App.1994), *trans. denied; Dillon v. Callaway*, 609 N.E.2d 424, 426 (Ind.Ct.App.1993), *trans. denied.*

The question in the present case is whether the Fund's arguments regarding Jeffrey's chances of survival before the Healthcare Providers' malpractice should be considered an argument about whether the Healthcare Providers were liable, the amount for which the Healthcare Provid-

---

**2.** At the time of the *Glover* decision, $100,000 was the statutory limit of health care provid-

ers' liability. *See id.* at 972–73 (citing I.C. § 16–9.5–4–3 (1988)).

ers were liable, or whether the damages sought are legally compensable at all. To do so, we look more closely at the nature of the argument the Fund wishes to make.

### III. *Mayhue* and Restatement Section 323

The Fund claims that it should have been allowed to argue that Jeffrey had only a small chance of surviving his illness even absent any malpractice on the part of the Healthcare Providers and that any malpractice thus cost Jeffrey only a small chance at survival. The Fund therefore argues that the Estate is entitled to claim only that portion of damages attributable to the chance of survival lost due to the malpractice. This argument involves the concept of "loss of chance," and was first addressed by our supreme court in *Mayhue v. Sparkman*, 653 N.E.2d 1384 (Ind. 1995).

In *Mayhue*, the plaintiff was unable to prove that the physician's negligence proximately caused his wife's death because she had less than a fifty percent chance of survival even before the negligent treatment. The trial court nevertheless denied the physician's motion for summary judgment. Upon appeal, this court adopted the "pure" loss of chance doctrine[3] and affirmed the trial court. *See id.* at 1385 (citing *Mayhue v. Sparkman*, 627 N.E.2d 1354 (Ind.Ct.App.1994)). Our supreme court then granted transfer and considered the issue of what to do in a situation where a patient has less than a fifty percent chance of survival, but a physician's negligence deprives them of any chance to survive. Rejecting the "pure" loss of chance

doctrine, the supreme court looked to Section 323 of the Restatement (Second) of Torts (1965) ("Section 323"), which provides in relevant part:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if:
>
> (a) his failure to exercise such care increases the risk of such harm, or;
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

*Mayhue*, 653 N.E.2d at 1388. Section 323 thus permits recovery from a defendant whose negligence significantly increases the probability of the ultimate harm, even if the likelihood of incurring that injury was greater than fifty percent in the absence of the defendant's negligence. *Id.; see also Cahoon v. Cummings*, 734 N.E.2d 535, 539 (Ind.2000).

In *Cahoon*, the court extended the holding in *Mayhue*, which dealt with a loss of consortium claim, to a claim of wrongful death. *Id.* at 539. In *Cahoon*, the court concluded that making a defendant liable for the full value of the wrongful death claim was inconsistent with the statutory requirement that the loss be caused by the defendant when the defendant had in fact only increased the risk of an already likely result. *Id.* at 541. Awarding full damages in a loss of chance situation would in effect hold physicians liable not only for their

---

**3.** As explained in *Mayhue*, the "pure" loss of chance doctrine stems from the case of *Hicks v. United States*, 368 F.2d 626 (4th Cir.1966), which concluded that:

> When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to

the measure of the chances that he has put beyond the possibility of realization. If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable.

*Mayhue*, 653 N.E.2d at 1387 (quoting *Hicks*, 368 F.2d at 632).

own negligence, but also for their patients' illnesses, which are not the product of the physicians' actions. *Id.* The court therefore set forth a formula for determining damages in such cases, explaining that "[i]n order to determine proportional damages, after liability is established, statistical evidence is admissible to determine the 'net reduced figure.'" *Id.* at 540 (citing *McKellips v. St. Francis Hosp., Inc.*, 741 P.2d 467, 476–77 (Okla.1987)). This net reduced figure is determined by subtracting the decedent's post-negligence chance of survival from the pre-negligence chance of survival. *Id.* (citing *McKellips*, 741 P.2d at 476–77). "Then, '[t]he amount of damages recoverable is equal to the percent of chance lost multiplied by the total amount of damages which are ordinarily allowed in a wrongful death action.'" *Id.* at 540–41 (quoting *McKellips*, 741 P.2d at 476–77); *see also Smith v. Washington*, 734 N.E.2d 548, 551 (Ind.2000) (applying the formula set forth in *Cahoon*).

### IV. Applying *Mayhue* and Glover

██ In the present case, the Fund contends that it should have been permitted to make a *Mayhue/Cahoon* argument that the Healthcare Providers' negligence actually cost Jeffrey only a small chance of survival and that the Estate's damages should reflect the loss of this small chance. As explained above, the question now be-

fore us is whether, under *Glover*, the Fund's argument is a permissible argument regarding the legally compensable nature of the damages sought, a permissible argument about the amount of damages owed to the Estate, or an impermissible argument regarding the ultimate question of liability.[4]

With regard to the question of compensability, we must conclude that the damages sought by the Estate are legally compensable. Here, the damages awarded by the trial court to the Estate were for funeral and burial expenses, loss of earnings, loss of services, and loss of love and affection—damages legally recoverable in a wrongful death action. See Ind.Code § 34–23–1–2 (1999); *Glover*, 597 N.E.2d at 973 (noting that the claimant sought only damages for decedent's death, which is a compensable injury). This is unlike the situations in *Kumiega* or *Rimert*, where the plaintiffs sought damages from the Fund that were not legally compensable. *See Rimert*, 680 N.E.2d at 876 (holding that trial court properly considered whether the damages underlying the claimant's request for excess damages were legally compensable and agreeing with trial court that damages sought were barred as a matter of public policy); *Kumiega*, 567 N.E.2d at 153 (concluding that a request for excess damages from the Fund was improper where plain-

---

4. In *Alexander v. Scheid*, 726 N.E.2d 272, 278–79 (Ind.2000), the court distinguished cases falling under Section 323, which presupposes physical harm has resulted from the negligent care, and cases in which the injury resulting from the physician's alleged malpractice has not yet, and might never, come to its full potential. For cases involving the latter situation, the court adopted something more akin to a "pure" loss of chance doctrine, concluding that such a plaintiff could maintain a cause of action in negligence for the "increased risk of harm" caused by the physician's malpractice. *Id.* at 281. Moreover, in such "increased risk of harm" actions, the loss of chance is "better understood

as a description of the injury [rather] than as either a term for a separate cause of action or a surrogate for the causation element of a negligence claim." *Id.* at 279. This is in contrast to Section 323, which the court described as permitting a cause of action "even though traditional causation standards may not be satisfied." *Id.; see also Sawlani v. Mills*, 830 N.E.2d 932 (Ind.Ct.App.2005) (discussing differences between *Mayhue* and *Alexander*), *trans. denied*. Because of Jeffrey's death, the present case obviously falls under Section 323 as adopted in *Mayhue*, and not under the "increased risk of harm" rule explained in *Alexander*.

tiff sought emotional damages which, under the then-applicable version of the "impact rule," were not recoverable).

The more difficult question is whether the Fund's Section 323 argument is one regarding liability or one regarding the amount of damages. Although this is not an easy question, we ultimately conclude that the Fund's arguments and evidence were properly excluded by the trial court. We recognize that, as explained in *Cahoon*, Section 323 does explain how to calculate the amount of damages in a case falling within the scope of Section 323. To this extent, we are not entirely unsympathetic to the Fund's position that it simply wants the opportunity to argue the amount of damages due the Estate, which is permissible under *Glover*. We disagree with the Fund, however, that Section 323, as adopted and explained in *Mayhue* and *Cahoon*, is applicable at all in the present case.

As explained in *Mayhue, Cahoon*, and *Alexander*, Section 323 permits a cause of action where traditional causation standards may not be satisfied. Thus, Section 323 provides an alternate to the traditional requirement of proximate cause. Here, however, pursuant to Indiana Code section 34–18–15–3(5), the settlement between the Estate and the Healthcare Providers established the Healthcare Providers' liability, and therefore also established proximate cause. *See Glover*, 597 N.E.2d at 973. Because proximate cause has been established by the settlement, the Estate has no need to resort to Section 323, which permits recovery in certain situations where proximate cause is impossible to establish.

We further note that the Fund made a similar argument which was rejected in *Glover*. Specifically, the Fund argued that the decedent in that case might have had a thirty percent chance to live five years, but after the missed diagnosis he had only an eight percent chance to live five years. 597 N.E.2d at 972. The *Glover* court dismissed the Fund's argument as being one about ultimate liability, which could not be litigated because of the settlement between the providers and the decedent's estate. *Id.* at 973.

We understand the Fund's warnings regarding the potential for unjust outcomes. If a patient truly has only a ten percent chance of survival, and the provider's malpractice denies them of this already-slim chance, why then should the Fund be required to pay one hundred percent of the damages stemming from the plaintiff's death? While this could pose a problem given the proper circumstances, we do not perceive such a problem in the present case. If a patient has only a small chance of survival, and the provider's malpractice acts only to deny a patient this small chance, then, under *Mayhue* and *Cahoon*, a plaintiff will only be able to recover a reduced amount of damages, and healthcare providers should not be overly eager to settle such claims. If a healthcare provider chooses to settle, however, the controlling statute establishes that provider's liability as a matter of law. *See* I.C. § 34–18–15–3(5). As explained in *Glover*, once liability is established, proximate cause is also established. 597 N.E.2d at 973. Where proximate cause is established by operation of the settlement, the claimant need not resort to Section 323 to recover, and the Fund cannot seek to diminish its liability by making an argument based upon Section 323.[5]

## Conclusion

Because the trial court properly concluded in its order granting partial summary

---

5. We express no opinion on the merits of the text of Indiana Code section 34–18–15–3(5) as it is currently written. We simply may not disregard the text of the statute. Any potential change is within the purview of our General Assembly.

judgment that the Fund could not argue that the Healthcare Providers' malpractice cost Jeffrey only a small chance of survival, the trial court also properly excluded the evidence the Fund sought to admit regarding Jeffrey's chances of survival. We therefore affirm both the trial court's grant of partial summary judgment and the trial court's final judgment.

Affirmed.

NAJAM, J., and BRADFORD, J., concur.