Carol **CUTTER, Indiana Commissioner of Insurance, as Administrator of the Indiana Patients' Compensation Fund, and the Indiana Patients' Compensation Fund, Appellants–Defendants/Cross–Appellees,**

v.

Geneva **HERBST, Personal Representative of the Estate of Jeffry A. Herbst, Deceased, Appellee–Plaintiff/Cross–Appellant.**

No. 49A04–1006–PL–343.

Court of Appeals of Indiana.

April 7, 2011.

Elizabeth H. Knotts, Rori L. Goldman, Hill Fulwider McDowell Funk & Matthews, Indianapolis, IN, Attorneys for Appellant.

Robert L. Thompson, Thompson & Rogers, Fort Wayne, IN, Richard L. Schultheis, Indianapolis, IN, Attorneys for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellants–Defendants/Cross–Appellees, Carol Cutter, Indiana Commissioner of Insurance, as Administrator of the Indiana Patients' Compensation Fund, and the Indiana Patients' Compensation Fund (collectively, the Fund), appeal the trial court's Order on Appellee–Plaintiff's/Cross–Appellant's, Geneva Herbst, as Personal Representative of the Estate of Jeffry A. Herbst (the Estate), motion to correct errors, awarding the Estate damages in the amount of $750,000 following a calculation of pre-negligence and post-negligence survival chances.

We affirm.

### ISSUE ON APPEAL

The Fund presents four issues on appeal, which we consolidate and restate as the following single issue: Whether the trial court erred when it concluded that Jeffry Herbst (Herbst) had a 50% pre-negligence survival chance versus a 10% post-negligence survival chance resulting in damages in the amount of $750,000.

### ISSUE ON CROSS APPEAL

The Estate presents one issue on cross-appeal, which we restate as follows: Whether the trial court erred when it concluded that Herbst's post-negligence chance of survival was 10% whereas his ultimate post-negligence chance of survival was 0%.

## FACTS AND PROCEDURAL HISTORY

On March 6, 2002, thirty-four-year-old Herbst suffered from a fever, congestion, nausea, loss of appetite, and decreased urine output. At 10:30 a.m. that morning, Herbst's primary care physician diagnosed the condition as bilateral pneumonia and sent him to the local hospital, the Lutheran Hospital in Fort Wayne, Indiana. Herbst arrived at the hospital at 11:43 a.m. gravely ill with cardiogenic shock. During the course of his hospitalization, Herbst had an electrocardiogram which demonstrated extensive damage to his heart with virtually no mechanical function. He died at 9:00 p.m. that night. An autopsy revealed that Herbst died of fulminant myocarditis, an inflammation of the heart characterized by acute and severe onset.

The Estate sought to bring a wrongful death action against the primary care physician, the physician's employer, and the hospital. The Estate's proposed complaint with the Indiana Department of Insurance pursuant to the Indiana Medical Malpractice Act (MMA), Ind.Code § 34–18–1–1, *et seq.*, alleged that the health care providers failed to comply with the appropriate standard of care in assessing and treating Herbst's condition and that this failure was a factor in his death. The parties to the underlying action completed the administrative requirements of the MMA and presented the matter to a medical review panel, which determined that the primary care physician had failed to meet the appropriate standard of care, but the failure was not a factor in Herbst's death. In addition, the panel found that the hospital met the appropriate standard of care, and made no finding regarding the physician's employer. The Estate settled with the primary care physician and the hospital under an agreement that permitted access to the Fund.[1]

On November 22, 2005, the Estate filed the instant action against the Fund, seeking the statutory maximum in additional damages. On March 16, 2006, the Estate moved for partial summary judgment, requesting a preliminary ruling that the trial court would determine the amount of damages owed without hearing evidence on the issue of liability or proximate cause. The Fund responded that it was not seeking to relitigate whether the providers were liable for Herbst's death, but rather was challenging the amount of damages attributable to the providers' conduct. On June 5, 2006, the trial court summarily granted the Estate's motion and subsequently denied the Fund's request to certify the interlocutory order as a final judgment.

On October 24, 2006, the trial court conducted a bench trial. During the trial, the Fund attempted to introduce expert testi-

---

1. Under the Indiana Medical Malpractice Act, the total recovery in a medical malpractice action is limited to $1,250,000 per injury or death. The Act caps a health care provider's malpractice liability at $250,000 per occurrence if the provider maintains sufficient insurance and pays the required surcharge to the Fund. I.C. §§ 34–18–3–1, –14–3(b). The Fund is financed by the surcharges collected from providers throughout the state and pays "excess damages." *Atterholt v. Herbst*, 902 N.E.2d 220, 222 (Ind.2009), *clarified on reh'g*, 907 N.E.2d 528 (Ind.2009). Recovery of excess damages from the Fund is allowed only after a health care provider or the provider's insurer has paid the first $250,000 or made a settlement in which the sum of the present cash payment and cost of future periodic payments exceeds $187,000. *Id.*; *see also* I.C. § 34–18–14–4(b). Multiple providers' cash payments and contributions to a periodic payments agreement are aggregated for purposes of the $187,000 requirement. *Id.*; *see also* I.C. § 34–18–14–4(c). If the Fund and the claimant cannot agree on the amount to be paid from the Fund, the trial court must hold a hearing to determine the amount for which the Fund is liable. *Id.*; *see also* I.C. § 34–18–15–3(4)–(5).

mony showing that even with proper care, Herbst had a less than ten percent chance of surviving the hospitalization, and had he survived, he would have been unable to return to work. The trial court excluded this evidence. At the close of the trial, the trial court found that the evidence established that the damages of the Estate and the beneficiaries, including funeral and burial expenses, loss of earnings, loss of services, and loss of love and affection and parental guidance would exceed the sum of $2,500,000 and awarded the Estate the remainder of the statutory maximum of $1 million, pursuant to the statutory guidelines.

The Fund appealed, arguing that the trial court erred in granting the partial summary judgment and in excluding the expert testimony. We affirmed the trial court in *Atterholt v. Herbst*, 879 N.E.2d 1221, 1227 (Ind.Ct.App.2008), *vacated on transfer*. On March 10, 2009, the supreme court granted transfer and held that the trial court erred by excluding the Fund's evidence of Herbst's risk of death prior to the occurrence of the malpractice. *See Atterholt v. Herbst*, 902 N.E.2d 220, 224 (Ind.2009). The supreme court remanded to the trial court for a determination of the Fund's liability.

On February 1, 2010, the trial court conducted a hearing on the remanded cause. During the hearing, the Estate reiterated its evidence and submitted new depositions from its medical experts. The Fund again offered the deposition of its expert, Dr. Michael Mirro (Dr. Mirro), which was admitted without objection.

On March 4, 2010, the trial court entered its findings of fact and conclusions of law, determining that the Estate was not entitled to any additional damages from the Fund and ordering judgment in favor of the Fund and against the Estate. In its Order, the trial court concluded in pertinent part that:

6. Based on his experience and training as a cardiologist, [Dr. Mirro] is qualified to provide this court with expert testimony regarding [Herbst's] probable prognosis at the time of his hospitalization on March 6, 2002.

7. The expert evidence of Dr. Mirro establishes that [Herbst] had a less than 20% chance of surviving discharge from hospital. Dr. Mirro bases this opinion on his experience as a cardiologist and the fact that [Herbst] presented in cardiogenic shock with evidence of extensive myocardial damage. Dr. Mirro also bases his opinions on [Herbst's] troponin level of 69.56, his echocardiogram which demonstrated his lack of cardiac function, and on his chest x-ray demonstrating congestive heart failure.

8. The expert evidence of Dr. Mirro establishes that even if [Herbst] had aggressive treatment (implantation of ventricular assist device or bridge to transplantation) his chance of surviving those aggressive treatments would be 50% thus reducing his survival rate to 10%.

9. The expert evidence of Dr. Mirro establishes that if [Herbst] had received hemodynamic support in the hospital, it would not have impacted his probability of survival.

10. The expert evidence of Dr. Mirro establishes that [Herbst] would not have returned to work even if he had received appropriate care in the hospital. Dr. Mirro was unaware of any case in which the patient suffered cardiogenic shock from myocarditis, underwent cardiac catheterization, implantation of a ventricular assist device, successful bridge to transplant, successful recovery from transplantation and returned to work.

\* \* \*

25. The [c]ourt finds that Dr. Mirro's testimony is the most credible and reliable expert testimony on the issue of [Herbst's] probability of survival based upon his education, training, and experience. Further, Dr. Mirro appeared to have a better understanding of [Herbst's] clinical picture. Dr. Mirro also performed his own literature search.

26. Using the $2,500,000 of damages cited in the [c]ourt's previous order, the evidence established that plaintiff is only entitled to recover 10% of this full amount damages, which is the amount proportional to the increased risk of harm attributable to the malpractice.

[27]. The [c]ourt finds that plaintiff is entitled to recover $250,000 in total damages.

[28]. This amount must be reduced by $250,000 based on the payment previously made to [the Estate] by the healthcare providers.

[29]. The [c]ourt finds that the [Estate] is not entitled to any additional amount of damages from the [Fund].

(Appellant's App. pp. 16–19).

On March 29, 2010, the Estate filed a motion to correct error claiming that Dr. Mirro's 10% survival chance is a post-negligence survival chance, not a pre-negligence survival chance. The Fund responded. A month later, on April 29, 2010, the trial court conducted a hearing on the Estate's motion to correct error.

On May 6, 2010, the trial court entered its Order on the Estate's motion, awarding the Estate $750,000 in damages payable by the Fund. The trial court's Order stated

1. The proper formula for determining the increased risk of harm is the pre-negligence chance of survival minus the post-negligence chance of survival.

2. The increased risk of harm damages is the dollar value of total harm suffered times the percentage of increased risk of harm attributable to the [Fund's] negligence.

3. In this case the pre-negligence chance of survival was 50% and the post-negligence change of survival was 10%. [50%–10%=40%]

4. Applying the formula: $2,500,000 × .40 = $1,000,000–$250,000 = $750,000.

5. The [Estate] is entitled to $750,000 from the [Fund].

(Appellant's App. p. 11).

The Fund now appeals and the Estate cross-appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### APPEAL

#### I. *Standard of Review*

■■■ The Fund contends that the trial court abused its discretion by granting the Estate's motion to correct error. A trial court has discretion to grant or deny a motion to correct error and we reverse its decision only for an abuse of that discretion. *Hawkins v. Cannon*, 826 N.E.2d 658, 661 (Ind.Ct.App.2005), *trans. denied.* An abuse of discretion occurs when the trial court's decision is against the logic and effect of the facts and circumstances before the court or if the court has misinterpreted the law. *Id.*

#### II. *Analysis*

Although the Fund divides its argument into four issues, the core of its reasoning centers on two points. First, the Fund asserts that the Estate waived its argument that Dr. Mirro's 10% opinion of Herbst's survivability should be characterized as a post-negligence chance of survival because the Estate failed to raise it

during the trial court's hearing on remand and did not make it until the hearing on the Estate's motion to correct error. Second, the Fund alleges that the trial court abused its discretion when it granted the Estate's motion to correct error. Specifically, the Fund contends that Dr. Mirro's opinion of Herbst's 10% survival chance amounted to a pre-negligence percentage of survivability; not a post-negligence chance of survival.

### A. *Waiver*

■ First, we turn to the Fund's waiver argument. The Fund maintains that the Estate waived the argument of pre-negligence versus post-negligence chance of survival because it was developed too late in the proceedings. Specifically, the Fund argues that it was not until the trial court's hearing on the Estate's motion to correct error that the Estate first claimed that Dr. Mirro's opinion was an evaluation of Herbst's post-negligence chance of survival. We disagree.

It should be noted that Dr. Mirro's testimony was not admitted into evidence until the damages hearing before the trial court after the supreme court remanded the case. During this hearing on February 1, 2010, the Estate presented an opening argument, the trial court admitted the depositions of both parties' experts without any objections by the Estate or the Fund, and both parties concluded the hearing with closing arguments. Thus, the remand hearing of February 1, 2010, was the first opportunity to develop proper arguments with respect to Dr. Mirro's testimony.

Because the trial court had not yet made a credibility determination with respect to the experts' depositions, it is logical trial strategy that besides focusing on Dr. Mirro's testimony the Estate also concentrated on the conclusions of its own experts. Nevertheless, during the closing arguments, the Estate fervently disputed Dr. Mirro's findings. Specifically, the Estate claimed, in pertinent part,

Dr. Mirro's testimony was rather interesting. In cross-examination, I asked Dr. Mirro, I said, "Doctor, what do you base your opinion that [Herbst] only had a 10 percent chance of survival?" He said, "Well, there was a CPK and Troponin tests taken and there was an echocardiogram that shows there was virtually no heart function and he was in shock." And I said, "Doctor, when was the blood drawn for the CPK and the Troponin test," and he was not sure. And we went to the records and we found out that the blood was drawn for the Troponin test within minutes before [Herbst] was pronounced dead.

The echocardiogram, when was that taken? Seventeen minutes before [Herbst] was pronounced dead. I said, "Well, Doctor, would it be reasonable to expect that earlier in the afternoon when [Herbst] came into the hospital that his Troponin level and his CPK would have been different?" "Yes, but we don't know."

"Do the Troponin level and the echocardiogram show the effects of his deterioration through the afternoon?" "Yes."

"They are not reflective of what his condition was when he came into the hospital?" "No."

I said, "Does that change your opinion?" And he said, "Well, under ideal circumstances, you have 50 percent chance of survival."

In other words, he went from 10 percent to 50 percent. And I asked him, what are ideal circumstances? He said, well, if he'd have been treated—if this had been recognized and he had been treated right after he got to the hospital. Well, that's what our negligence is in this case. He wasn't treated right after

he got to the hospital. So Dr. Mirro's optimum circumstances are just what the negligence in this case is all about. And under those circumstances, even he says that [Herbst] would have had a 50 percent chance of survival.

\*   \*   \*

Dr. Mirro says that he did a literature search, but when I asked him can you give us any references, like any studies or any reports, medical studies or reports that would substantiate either your 10 percent or your 50 percent opinion with regard to likelihood of survival, he said no, he could not.

(Transcript pp. 117–19).

Although the Estate did not explicitly use the language of pre-negligence and post-negligence chance of survival, it clearly challenged Dr. Mirro's allocation of survival chances and the timing thereof. Thus, the Estate sufficiently raised this particular argument at the first possible opportunity following the admission of the evidence. As such, we conclude that the Estate did not waive the pre-negligence versus post-negligence survival argument.

### B.  *Survival Chances and Calculation of Damages*

The Fund next alleges that the trial court abused its discretion when it granted the Estate's motion to correct error. Specifically, the Fund claims that because Dr. Mirro's testimony established that Herbst had a 10% chance of surviving the fulminant myocarditis but for the medical malpractice, the Estate is only entitled to damages in proportion to the increased risk of harm that was caused by the malpractice. In other words, the Fund contends that Dr. Mirro's opinion clearly demonstrates that Herbst's survival chances before the occurrence of the negligence amounted to 10%; as such, the Fund maintains that the trial court's order on the

Estate's motion to correct errors constituted an abuse of discretion by concluding that Herbst's survival chance pre-negligence was 50% which decreased to 10% post-negligence.

■■■■  In general, a plaintiff must prove each of the elements of a medical malpractice case:  (1) the physician owed a duty to the plaintiff;  (2) the physician breached that duty;  and (3) the breach proximately caused the plaintiff's injuries.  *Sawlani v. Mills,* 830 N.E.2d 932, 938 (Ind.Ct.App. 2005), *trans. denied.*  In *Mayhue v. Sparkman,* 653 N.E.2d 1384, 1386 (1995), our supreme court held that a plaintiff is not precluded from bringing a medical malpractice claim merely because the plaintiff is unable to prove by a preponderance of the evidence that the doctor's conduct was the proximate cause of the resulting injury.  In so holding, the court adopted Section 323 of the Restatement (Second) of Torts which provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or;
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

*Id.* This doctrine permits recovery from a defendant whose negligence significantly increases the probability of the ultimate harm, even if the likelihood of incurring that injury was greater than 50% in the absence of the decedent's negligence. *Haas v. Bush,* 894 N.E.2d 229, 232 (Ind.

Ct.App.2008), *trans. denied.*[2]

■ "[U]pon a showing of causation under *Mayhue,* damages are proportional to the increased risk attributable to the defendant's negligent act or omission." *Cahoon v. Cummings,* 734 N.E.2d 535, 541 (Ind.2000). Focusing again on Section 323 of the Restatement (Second) of Torts, the supreme court in *Cahoon* adopted the Restatement's standard for measuring damages. Specifically, the *Cahoon* court explained that in order to compute proportional damages, "statistical evidence is admissible to determine the 'net reduced figure.'" *Id.* The court explained that this "net reduced figure" is determined by "subtracting the decedent's post-negligence chance of survival from the pre-negligence chance of survival." *Id.* at 540. Thereafter, "[t]he amount of damages recoverable is equal to the percent of chance lost multiplied by the total amount of damages which are ordinarily allowed in a wrongful death action." *Id.* at 540–41.

■ The policy behind this calculation is the view that holding the defendant liable for the full value of the wrongful death claim is inconsistent with the statutory requirement that the loss be caused by the defendant who only increased the risk of a likely result. *Id.* at 541. Any other computation would effectively hold doctors liable not only for their own negligence, but also for their patients' illnesses, which are not the product of the doctors' actions. *Id.* To be sure, the imposition of this rule might encourage doctors to be more vigilant, but compensation for injuries caused, not deterrence of future actions, is the basis of recovery the legislature has chosen for a wrongful death. *Id.*

In cases such as these, a plaintiff claims the doctor's negligence increased the risk of harm by hastening or aggravating the effect of his pre-existing medical condition or risk. Although there are few certainties in medicine or in life, progress in medical science now makes it possible, at least with regard to certain medical conditions, to estimate a patient's probability of survival to a reasonable degree of medical certainty. That probability of survival is part of the patient's condition. When a doctor's negligence diminishes or destroys a patient's chance of survival, the patient has suffered a real injury. The patient has lost something of great value: a chance to survive, to be cured, or otherwise to achieve a more favorable medical outcome. As such, doctors or other health care providers should not be given the benefit of the uncertainty created by their own negligent conduct. To hold otherwise would in effect allow them to evade liability for their negligent actions or inactions in situations in which patients would not necessarily have survived or recovered, but still would have a chance of survival or recovery.

Prior to turning to the expert evidence before us, we note the credibility determination expressed by the trial court. In its order of March 4, 2010, the trial court found Dr. Mirro's testimony the most credible and reliable expert testimony on the issue of Herbst's probability of survival. The trial court's conclusion is binding on this court and therefore, we will solely focus on Dr. Mirro's testimony.

---

**2.** We should note that the application of Section 323 of the Restatement (Second) of Torts to cases where the patient has a better than 50% chance of survival absent the medical malpractice has been placed into doubt by C.J. Robb's analysis in her dissent to the majority's order denying the petition for rehearing in *Indiana Dep't. of Ins. v. Everhart,* 932 N.E.2d 684 (Ind.Ct.App.2010), *reh'g denied,* 939 N.E.2d 1106 (Ind.Ct.App.2010).

With respect to Herbst's chance of survival, both parties focus their arguments on different percentages pronounced by Dr. Mirro in his testimony. On the one side, the Fund claims that the evidence reflects that Herbst's pre-negligence chance to survive the fulminant myocarditis was 10%; whereas on the other side, the Estate, drawing from the same testimony, asserts that Herbst had a 50% chance to be saved prior to the occurrence of the medical malpractice. Reading Dr. Mirro's deposition, it is clear that these percentages fluctuate depending on the timeline of Herbst's medical care in the hospital.

The record reflects that at 10:30 a.m. on March 6, 2002, thirty-four-year-old Herbst was diagnosed with bilateral pneumonia by his primary care physician, who sent him to the local hospital. When Herbst arrived at the hospital at 11:43 a.m., he was "gravely ill with cardiogenic shock with acute congestive heart failure." (Appellant's App. p. 138). Dr. Mirro stated that at the time of admission, Herbst showed "all the signs and symptoms of severe heart failure and consistent with cardiogenic shock, pulse of 120, blood pressure was low. [He] was complaining of severe respiratory distress." (Appellant's App. p. 152). Dr. Mirro explained that if he had been called at that time to consult in Herbst's care, he would have ordered a "complete history and physical, electrocardiogram, and echo," and Herbst would have immediately undergone cardiac catheterization to determine whether he had a blockage or if he had myocarditis. (Appellant's App. p. 162). "[Herbst] would have received hemodynamic support either with intravenous isotopes and/or mechanical support." (Appellant's App. p. 162). "[I]f

there was evidence that he had poor hemodynamics with inotropic support, then he would get an intra-aortic balloon." (Appellant's App. p. 162). Dr. Mirro opined that in the most optimistic circumstances, *i.e.,* when initially seen in the office and hospitalized and cared for properly, Herbst had at best a 50% chance of surviving the hospitalization. He added that "if at that point in time [Herbst] had not been given appropriate hemodynamic—aggressive hemodynamic support, that he [ ] very likely would not [survive]." (Appellant's App. p. 152). Nonetheless, none of the tests as outlined by Dr. Mirro's best case scenario ever took place.

Throughout the afternoon, Herbst's level of cardiogenic shock became more and more severe. Although Herbst's oxygen saturation was relatively normal until late in the afternoon, at 4 p.m. his saturation became very inadequate. At 8 p.m., a chest x-ray showed congestive heart failure, but not the severity of the failure. (*See* Appellant's App. p. 148). At 8:45 p.m.—25 minutes after Herbst had coded and approximately 17 minutes before he was pronounced dead—his blood was drawn to calculate his Troponin[3] level. (*See* Appellant's App. pp. 148–49). This blood draw indicated extensive heart muscle damage as his Troponin level was substantially elevated to 69.56, whereas the upper limit of normal is .1. The echocardiogram, which according to Dr. Mirro's best case scenario should have been taken upon Herbst's admission, was performed during the code immediately preceding Herbst's death and shortly before resuscitation efforts were discontinued. (Appellant's App. p. 147). This echo demonstrated "virtually no mechanical function." (Appellant's App. p. 138).

---

3. Troponin "is a biomarker for cell damage, most especially for the heart." (Appellant's App. p. 138).

In support of its argument that Herbst only had a 10% pre-negligence chance of survival, the Fund focuses the core of its argument on Dr. Mirro's statement

[Herbst] presented with cardiogenic shock with evidence of extensive myocardial damage as illustrated by the elevation of Troponin and the echocardiogram and in an individual cardiogenic shock at the time of the cardiac catheterization cannot be successfully intervened upon with a stent or some other methods of improving their cardiac performance. The probability of surviving the hospital discharge is only 20 percent, so let's say he did survive the hospital discharge, there is a 20 percent chance he would have survived.

If he had a ventricular assist device implanted of the three to 400 ventricular assist devices that are implanted for bridge to transplantation, which is presumedly what would have happened with him, only 50 percent of those patients survive successfully. So, even if he had an aggressive approach, such as bridge to transplantation, he only had a 50 percent chance of surviving. So there, you are down to 10 percent.

(Appellant's App. p. 138). Dr. Mirro explained that he based this opinion of 10% survivability "in large part upon [Herbst's] Troponin level," as well as on the echocardiogram, and the chest x-ray indicating congestive heart failure. (Appellant's App. p. 145).

In calculating Herbst's proportional damages, we have to subtract Herbst's post-negligence chance of survival from his pre-negligence chance of survival. *See Cahoon,* 734 N.E.2d at 540. Based on the evidence before us, the negligence occurred when Herbst's primary care physician misdiagnosed him with pneumonia and the hospital failed to order the appropriate tests in a timely fashion. At that point in time, Dr. Mirro opined that in the most optimistic circumstances, *i.e.,* when initially seen at the office and hospitalized and cared for properly, Herbst had at best a 50% chance of surviving the hospitalization. Also, it is apparent that Dr. Mirro's 10% chance of survivability was largely based on test results recording Herbst's medical condition nearly 7 to 9 hours after his admission to the hospital, after he had coded and just minutes before he was pronounced dead. At this point in time, the negligence had already occurred, or at the very least, was in progress.

As we stated above, health care providers should not be given the benefit of the uncertainty created by their own misconduct. When the medical negligence diminishes a patient's chances for a more favorable outcome, the patient has suffered an injury and must be compensated for the loss of a chance. Mindful of this principle, we conclude that the evidence establishes that Herbst's pre-negligence chance of survival amounted to 50%. Herbst's primary care physician's and the hospital's medical negligence significantly decreased his chances for survival. We affirm the trial court's grant of the Estate's motion to correct error with respect to the pre-negligence chance of survival.

## CROSS APPEAL

On cross-appeal, the Estate now contends that the trial court erred in its motion to correct error when it determined Herbst's post-negligence chance of survival to be 10%. Specifically, the Estate claims that in calculating the proportional damages only the ultimate post-negligence chance of survival can be taken into account. As such, the Estate maintains that because Herbst's death was the end result of the medical malpractice, the post-negligence chance of survival should be 0%.

■ We disagree. When our supreme court outlined the proportional damages' calculation in *Cahoon*, the court clearly held that "the amount of damages recoverable is equal to the percent of *chance* lost multiplied by the total amount of damages which are ordinarily allowed in a wrongful death action." *Cahoon*, 734 N.E.2d at 540–41 (emphasis added). In other words, loss of chance is a decrease in the patient's *probability* of recovery, rather than the ultimate inevitable outcome. *See Alexander v. Scheid*, 726 N.E.2d 272, 279 (Ind. 2000). Accepting the Estate's argument would in essence amount to making the Fund liable for the full value of the wrongful death claim. This holding would be inconsistent with the statutory requirement that the defendant should only be liable for the increase in risk already leading to a likely result. *See Cahoon*, 734 N.E.2d at 541.

Taking into account the negligent actions of the primary care physician and the hospital, Dr. Mirro opined that Herbst's post-negligence chance of survival was 10%. He based this percentage on Herbst's Troponin level and echocardiogram taken minutes before he died. In its motion to correct error, the trial court calculated the proportional damages based on Herbst's 50% pre-negligence chance of survival and 10% post-negligence chance of survival. Finding this computation to be in line with our supreme court's guidelines in *Cahoon*, we affirm the trial court in every respect.

## CONCLUSION

Based on the foregoing, we conclude that the trial court properly calculated proportional damages in the amount of $750,000 payable by the Fund to the Estate for the health care providers' medical malpractice.

Affirmed.

BROWN, J., concurs.

ROBB, C.J., dissents with separate opinion.

ROBB, Chief Judge, dissenting.

I respectfully dissent. As does the majority, I note the evidence supports the trial court's determination that Herbst's pre-negligence chance of survival was at least 50%.[4] *See* op. at 250. Because his pre-negligence chance of survival was 50%, however, I disagree with affirming the trial court's use of the *Mayhue*/Restatement approach to calculate the damages. As I explained in greater detail in my dissent from the denial of rehearing in *Indiana Dep't of Ins. v. Everhart*, 939 N.E.2d 1106 (Ind.Ct.App.2010), I believe the supreme court in *Mayhue* adopted the Restatement approach in which damages are assessed for the increased risk of harm for only those cases in which proximate cause for the ultimate injury could not otherwise be proven because the patient already had a greater than 50% chance of that injury occurring even in the absence of negligence. Where the patient's chance of survival is greater than 50% absent the negligence, however, traditional tort principles adequately address the injury and applying the Restatement approach is unnecessary. Because the trial court determined,

---

**4.** In addition to the testimony cited by the trial court, there was also testimony that Herbst's chances of survival may have been greater than 50%. *See* Appellee's App. at 84 (deposition testimony of Paul L. McHenry, M.D., that if he had been given appropriate treatment, "I have no reason to believe [Herbst] wouldn't have fallen into the high 50 percent or higher range" of survivability); *id.* at 137 (deposition testimony of Mark Farber, M.D., that the outcomes for people with similar conditions to Herbst who receive adequate treatment is "survival of between 70 and 80 percent.").

based upon the expert testimony, that Herbst's chance of survival absent medical negligence was 50%, I do not believe using the Restatement measure of damages is appropriate in this case. Thus, I would remand to the trial court for a recalculation.